N. B. BROWARD, *et al.*, AS TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, *Appellants*, v. ELBERT N. MABRY, *Appellee.*

1. Under the common law of England the Crown in its sovereign capacity held the title to the beds of navigable or tide waters, including the shore or the space between high and low water marks, in trust for the people of the realm who had rights of navigation, commerce, fishing, bathing and other easements allowed by law in the waters. This rule of the common law was applicable in the English colonies of America.

2. After the Revolution resulting in the independence of the American States, title to the beds of all waters, navigable in fact, whether tide or fresh, was held by the States in which they were located, in trust for all the people of the States respectively.

3. When the constitution of the United States became operative, the several States continued to hold the title to the beds of all waters within their respective borders that were navigable in fact without reference to the tides of the sea, not for purposes of disposition to individual ownerships, but such title was held in trust for all the people of the States respectively, for the uses afforded by the waters as allowed by the express or implied provisions of law, subject to the rights surrendered by the States under the Federal constitution.

4. The right of the people of the States in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low watermarks, relate to navigation, commerce, fishing, bathing, and other easements allowed by law. These rights are designed to promote the general welfare and are subject to lawful regulation by the States and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, &c. and to the constitutional guarantees of private property rights.

5. The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the States. For the purpose of enhancing the rights and interests of the whole people, the States may by appropriate means grant to individuals the title to limited portions of the lands under navigable waters, or may give limited privileges therein, but not so as to divert them from their proper uses for the public welfare, or so as to relieve the States respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress.

6. New States, including Florida, admitted "into the Union on equal footing with the original States, in all respects whatsoever," have the same rights, prerogatives and duties with respect to the navigable waters and the lands thereunder

within their borders as have the original thirteen States of the American Union. Among these prerogatives are the right and duty of the States to own and hold the lands under navigable waters for the benefit of the people, as such prerogatives are essential to the sovereignty, to the complete exercise of the police powers and to the welfare of the people of the new States as of the original States of the Union.

7. The provision in the Act of Congress of March 3rd, 1845, admitting Florida into the Union "on the express condition that (the State) shall never interfere with the primary disposal of the public lands lying within," the State, has reference to lands within the territorial limits of the State, the title to which was in the United States for its own purposes, as distinguished from lands held in trust for the people, such as lands under navigable waters, which passed to the State in its sovereign capacity to be held by it in trust for the people thereof, for the public purposes authorized by law subject to the power of Congress under the Federal Constitution.

8. After the United States acquired by treaty of cession from Spain the territory known as East and West Florida such territory was held subject to the constitution and laws of the United States. Upon its admission into the Union Florida has the same rights and duties of sovereignty that the original States of the Union have.

9. Whether a stream or body of water is navigable for useful public purposes is to be determined by the application of existing provisions and principles of law to particular facts of separate cases.

10. Where a stream or body of water is permanent in character and in its ordinary natural state is in fact navigable for useful purposes, and is of sufficient size and so situated and conditioned that it may be used for purposes common to the public in the locality where it is located, such water may be regarded as being of a public character, and the title to the land thereunder, including the shore or space between ordinary high and low water marks, when not included in the valid terms of a grant or conveyance to private ownership, is held by the State in its sovereign capacity in trust for the lawful uses of all the people of the State in the water and the land, subject to lawful governmental regulation of such uses.

11. Capacity for navigation, not usage for that purpose, determines the navigable character of waters with reference to the ownership and uses of the land covered by the water.

12. Grants and conveyances of land bordering on navigable waters carry title in general to ordinary high water mark when a valid contrary intent does not appear.

13. Those who own land extending to ordinary high water mark of navigable waters are riparian holders who, by implication of law, and in addition to the rights of navigation, commerce, fishing, boating, &c. common to the public, have in general certain special rights in the use of the waters opposite their holdings, among them being the right of access from the water to the riparian land and perhaps other easements allowed by law. These special rights are easements incident to the riparian holdings and are property rights that may be regulated by law but may not be taken without just compensation and due process of law.

14. Riparian rights arise by implication of law and give no title to the land under navigable waters except such as may be lawfully acquired by accretion, reliction and other similar rights.

15. The Trustees of the Internal Improvement Fund who have the disposal of the swamp and overflowed lands of the State have no authority to convey the title to the lands under navigable waters that properly belong to the sovereignty of the State.

16. Where it appears that the waters of an inland lake are in fact navigable for useful public purposes, the title to the lands under such navigable waters is held by the State in trust for all the people of the State for the uses and purposes allowed by law, and when it appears that the owners of the lands abutting on the lake are entitled to the riparian rights given by law to such owners, a contemplated sale or conveyance of the lands under the waters of the lake by the Trustees of the Internal Improvement Fund may be enjoined at the suit of such riparian owners, even though the State in its sovereign capacity is not specifically made a party to the suit.

Decree affirmed in part.

Decree reversed in part.

This case was decided by Division A.

Appealed from the Circuit Court for Leon County.

The facts in the case are stated in the opinion of the court.

*W. S. Jennings, L. R. Milton* and *Park Trammell,* Attorney General, for Appellants;

*F. T. Myers,* for Appellee.

WHITFIELD, C. J.—The appellee filed in the circuit court for Leon county a bill in equity alleging in brief that township 2 north, of range 1 west, in Leon county, Florida, was surveyed by James Donelson by direction of the United States government in 1824 according to the system of surveying adopted and then in use by said government; that within said township 2 and township 1 north, of range 1 west, lying to the south of township 2, was a natural lake designated on the plats of the survey as Lake Jackson, by which name it has since been generally known and called; that in surveying said township the sections bordering on said lake were made fractional sections and the line of the lake, where the said fractional sections border it, was meandered; that said lake was not at the time of the survey and has never been a navigable body of water; that sections 26 and 27 of said township 2 are, according to said survey, fractional sections bordering on said lake, and both said sections are shown by the official plat of said survey to be subdivided into lots;

that section 27 is shown to comprise but two lots num-
bered 1 and 2, which are stated on the plat to contain
respectively eighty and one hundred acres, but only lot 2
is shown to border on the waters of said lake; that section
26 is shown to comprise 7 lots, but only lot 5 of said
section, which is stated on said plat to contain 103.50
acres, is shown to border on the waters of said lake;
that in 1825 James Dickerson purchased from the United
States at private cash entry lots 1 and 2 of section 27,
township 2 N., R. 1 W.; that said lots, according to the
official map in the Surveyor General's office, appear to be
the whole of said fractional section 27, and patents were
issued to Dickerson therefor by the United States in 1826,
conveying to him and his heirs the said lands, by the
designated lot numbers, according to the official plat of
the survey of said lands returned to the Surveyor Gen-
eral's office, and without any reservation as to the sub-
merged lands in front thereof; that likewise William
Harris purchased and in 1826 received patents conveying
to him and his heirs lot No. 5 of section 26, T. 2 N., R. 1.
W. without reservation as to the submerged lands in
front thereof; that in 1852, at the request of the Sur-
veyor General, Township 2 North, of Range 1 West was
re-surveyed by Arthur Randolph and a new meander line
of Lake Jackson was made, by which additional lots 3, 4,
5 and 6 were added to fractional section 27, and an addi-
tional lot 8 was added to section 26; that the question of
the title to the said additional lots of section 27, shown
by the Randolph survey, was presented to the Secretary
of the Interior on an application to pay for and receive
a patent for the said additional lots of section 27, as
shown by the Randolph survey, and the Secretary of the
Interior decided that the successors in title to Dickerson
were entitled under his purchase to a conveyance of all
the lands embraced in the lots of the Donelson survey

according to the field notes thereof upon payment for the full area embraced therein; that a patent was issued accordingly in the name of Dickerson for the additional said lots shown as being a part of fractional section 27 and intended to be sold as part of lot 2 of said section; that at the time of the survey of 1824 the land fronted and bordered on Lake Jackson, and was bought and sold with reference to its frontage on said lake, as shown by the meander thereof; that under and by virtue of the said patents the title to the submerged lands in front of the upland described in said patents, to the middle of the said lake passed to said Dickerson in fee simple; that likewise the patent issued to Harris conveyed title to the submerged lands in front of the uplands described in his patent to the middle of said lake in fee simple; that appellee is the successor in title thereto; that a patent had been issued in 1883 to the State of Florida under the Swamp Land Grant Act of Congress of September 28, 1850, covering the unsurveyed parts of sections 26 and 27 in township 2 north, of range 1 west; that the appellants, defendants below, hold in trust the title so attempted to be conveyed to the State; that the unsurveyed parts of sections 26 and 27 so patented to the State embraced the submerged lands in front of said lots in said sections 26 and 27 to the middle of Lake Jackson; that quite recently the waters of Lake Jackson have, from natural causes not fully known, almost entirely disappeared, and the lands originally submerged are now uncovered; that upon information and belief it is alleged that propositions have recently been made to the defendant Trustees of the Internal Improvement Fund to buy all of the unsurveyed lands aforesaid which front the upland acquired and owned by the complainant as stated, and the title to which from the shore to what was lately the middle of said lake is vested in complainant; that

defendants are likely to sell said lands unless enjoined; that the said patent to the State did not pass title to the submerged lands, but is a cloud on complainant's title. Appropriate relief is prayed.

A demurrer to the bill of complaint, on grounds that complainant's title was not shown, was overruled, and defendants answered denying that the patents issued to Dickerson "conveyed title to lands beyond the lines fixed and established by said official surveys, plats and field notes, and allege that such limitation, description and boundary so fixed and established was a reservation on behalf of the United States government of the submerged lands in front thereof, lying between the boundary line so established and fixed and stated in said patents based upon said surveys and field notes, to and including the center or thread of the lake." A replication was filed. Subsequently the cause was submitted to the chancellor on an agreed statement of facts, stating in brief: that Lake Jackson "was at the time of said survey a natural lake," "a body of water of irregular shape lying partly in the two townships named. At mean water it will average not over two feet in depth, except in a few basins where the water may be eight or ten feet deep. These basins are four or five in number, scattered over the lake at irregular intervals, and separated by long reaches of shallow water. They are of an average of four or five acres in extent, except the largest which may reach ten or fifteen acres. The water, except in these basins, is thick with water grasses, and cattle from adjoining plantations graze all over it from hoof to belly deep. In several places there are fords across the main body and broadest portions of the lake which are used at all seasons by persons going back and forth between their plantations and Tallahassee, on horseback and in buggies and wagons. The lake can only be navigated at ordinary stage with flat

bottomed boats drawing from three to six inches of water, except in the basins mentioned; and in fact the only navigation is in boats, or bateaux of the character mentioned, in fishing and shooting water fowl. There are one or more subterranean outlets, or sinks, through which the waters of the lake at times escape, leaving the entire bed, except in a few of the basins mentioned, entirely dry, and at such times persons can walk dry-shod over the whole bed of the lake. This situation existed at the time the bill in this case was filed, and when the negotiations for the sale of the unsurveyed portion of said lake charged in the bill were pending. The lake is partly surrounded by hills, and in time of excessive rains reaches a greater average depth than stated above as its mean depth, but the waters soon recede, and the lake returns to its normal condition. During ordinary low water the lake recedes to such an extent that corn is planted and grown on the bottom lands constituting a part of the bed of the lake, to a considerable distance from the shore, by the occupants of the uplands. The principal, and almost the only use the waters of the lake are put to is for the grazing of cattle, and fishing and fowling. The conditions stated have practically been the same as far back as the memory of the oldest inhabitant familiar with the locality reaches;" that in making said survey the lake was meandered; that lot 2 in said fractional section 27 and lot 5 in said fractional section 26 border on said lake.

The chancellor held that the patents to Dickerson and Harris conveyed title to the middle of the lake and that the patent to the State is a cloud upon the appellee's title to the land between the meander line and the middle of the lake. A decree was entered accordingly and the defendants appealed.

The question to be determined is whether under the patents to Dickerson and Harris they took title to the

land to the middle of the lake. No question of accretion, alluvion or reliction, or of public or of riparian rights in the use of the water, if any exist, is presented. The State in its sovereign capacity is not represented here, but if it be found that this lake is in fact navigable so as to vest the title to the bed of it in the State by virtue of its sovereignty, the relief asked by the complainant cannot be granted, though the complainant may be entitled to riparian rights as well as to easements in the lake in common with the public.

Under the common law of England the Crown in its sovereign capacity held the title to the beds of navigable or tide waters, including the shore or the space between high and low-water marks, in trust for the people of the realm who had rights of navigation, commerce, fishing, bathing and other easements allowed by law in the waters. This rule of the common law was applicable in the English colonies of America. After the Revolution resulting in the independence of the American States, title to the beds of all waters, navigable in fact, whether tide or fresh, was held by the States in which they were located, in trust for all the people of the States respectively. When the Constitution of the United States became operative, the several States continued to hold the title to the beds of all waters within their respective borders that were navigable in fact without reference to the tides of the sea, not for purposes of disposition to individual ownerships, but such title was held in trust for all the people of the States respectively, for the uses afforded by the waters as allowed by the express or implied provisions of law, subject to the rights surrendered by the States under the Federal constitution. The rights of the people of the States in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low water marks, relate to navigation, commerce, fishing,

bathing, and other easements allowed by law. These rights are designed to promote the general welfare and are subject to lawful regulation by the States, and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, etc., and to the constitutional guarantees of private property rights. The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the States. For the purpose of enhancing the rights and interests of the whole people, the States may by appropriate means grant to individuals the title to limited portions of the lands under navigable waters, or may give limited privileges therein, but not so as to divert them from their proper uses for the public welfare, or so as to relieve the States respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress. New States, including Florida, admitted "into the Union on equal footing with the original states, in all respects whatsoever," have the same rights, prerogatives and duties with respect to the navigable waters and the lands thereunder within their borders as have the original thirteen states of the American Union. Among these prerogatives are the right and duty of the states to own and hold the lands under navigable waters for the benefit of the people, as such prerogatives are essential to the sovereignty, to the complete exercise of the police powers and to the welfare of the people of the new states as of the original states of the Union. The provision in the Act of Congress of March 3rd, 1845, admitting Florida into the Union "on the express condition that (the State) shall never interfere with the primary disposal of the public lands lying within," the State, has reference to lands within the territorial limits of the State, the title to which was in the United States for its

own purposes, as distinguished from lands held in trust for the people, such as lands under navigable waters, which passed to the State in its sovereign capacity to be held by it in trust for the people thereof, for the public purposes authorized by law subject to the power of Congress under the Federal Constitution. Shiverly v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; City of Chicago v. Illinois Cent. R. Co., 146 U. S. 387, 13 Sup. Ct. Rep. 110; State v. Black River Phosphate Co., 32 Fla. 82, 13 South. Rep. 640, 21 L. R. A. 189 and notes.

After the United States acquired by treaty of cession from Spain the territory known as East and West Florida such territory was held subject to the constitution and laws of the United States. Upon its admission into the Union Florida has the same rights and duties of sovereignty that the original states of the Union have.

Whether a stream or body of water is navigable for useful public purposes is to be determined by the application of existing provisions and principles of law to particular facts of separate cases.

Where a stream or body of water is permanent in character and in its ordinary natural state is in fact navigable for useful purposes, and is of sufficient size and so situated and conditions that it may be used for purposes common to the public in the locality where it is located, such water may be regarded as being of a public character, and the title to the land thereunder, including the shore or space between ordinary high and low water marks, when not included in the valid terms of a grant or conveyance to private ownership, is held by the State in its sovereign capacity in trust for the lawful uses of all the people of the State in the water and the land, subject to lawful governmental regulation of such uses. Capacity for navigation, not usage for that purpose, determines the navigable character of waters with reference to the own-

ership and uses of the land covered by the water. Grants and conveyances of land bordering on navigable waters carry title in general to ordinary high water mark when a valid contrary intent does not appear. Those who own land extending to ordinary high-water mark of navigable waters are riparian holders who, by implication of law, and in addition to the rights of navigation, commerce, fishing, boating, &c., common to the public, have in general certain special rights in the use of waters opposite their holdings, among them being the right of access from the water to the riparian land and perhaps other easements allowed by law. These special rights are easements incident to the riparian holdings and are property rights that may be regulated by law but may not be taken without just compensation and due process of law. Riparian rights arise by implication of law and give no title to the land under navigable waters except such as may be lawfully acquired by accretion, reliction and other similar rights. See Bucki v. Cone, 25 Fla. 1, 6 South. Rep. 160; State v. Gerbing, 56 Fla. 603, 47 South. Rep. 353; Ferry Pass Inspectors' & Shippers' Ass'n v. White's River Inspectors & Shippers' Ass'n, 57 Fla. ..., 48 South. Rep. 643; State v. Black River Phos. Co., 32 Fla. 82, 13 South. Rep. 640; Lamprey v. State, 52 Minn. 181, 53 N. W. Rep. 1139; 18 L. R. A. 670; Mobile Dry Docks Company v. City of Mobile, 146 Ala. 198; 40 South. Rep. 205, S. C. 9. Am. & Eng. Anno. Cas. 1229 and notes; Hot Springs L. & M. Co. v. Revercomb, 106 Va. 176, 55 S. E. Rep. 580; Schulte v. Warren, 218 Ill. 108, 75 N. E. 783, 1 Enc. L. & P. 795 et seq.

When the sovereign grants or conveys the title to land under navigable water such title passes subject to the public easements and to the riparian rights allowed by law.

Notwithstanding the allegation of the bill of complaint

"that the lake was not at the time of the survey   *   *   * and has never been a navigable body of water," the allegations that it is "a natural lake" extending into different townships and being several miles in extent as shown by the plat; that the land was bought "with reference to its frontage on said lake;" that in making the survey the lake was meandered and so platted; that recently the waters of the lake have "from natural causes not fully known, almost entirely disappeared, and the lands originally submerged are now uncovered," and other circumstances indicate that the lake is of considerable size and permanent in its character, and that the land in its ordinary state is the bed of a lake and not merely submerged with water so shallow or so situated and conditioned as to be not navigable for any useful public or common purpose located as it is in an agricultural region where numerous plantations on the surrounding uplands are occupied.

In the agreed statement of facts it is stated that the lake was meandered as a body of water, that it extends into two townships and is a natural lake that in *mean* water *averages* not over two feet in depth, except in certain places where it may be eight or ten feet deep; that the lake can only be navigated at *ordinary* stage with flat bottom boats drawing from three to six inches of water; that the water at times escapes through subterranean outlets and the lake becomes dry; that portions of the bed adjacent to the shore are at times planted in crops, and that the lake is forded in places. The official plat of the survey shows the lake to be several miles in extent and that the surrounding uplands are subdivided into small tracts for purposes of individual ownership.

From the allegations and admissions upon this record it appears that notwithstanding the shallowness of the water in portions and the uses at times made of its bed

in places bordering on the shore, the permanency, size, location, character and conditions of the lake are such that in its ordinary state it, or at least a large part of it, may be used for purposes of utility common at least to the people of the community in which it is located, and consequently that such waters may be regarded as being of a public character useful in ordinary conditions to numerous riparian owners, if not to the general public, for purposes of navigation, fishing, bathing and other lawful uses, so that the title to the bed of the lake vests in the State in trust for all the people of the State.

The products of the community at least in some considerable measure may be transported upon the waters if so desired, and the waters are admittedly of considerable area and useful for general navigation in small boats containing persons engaged in pursuits either of business or pleasure. Whether the lake has been used for commercial purposes or not is immaterial if it may be made useful for any considerable navigation or commercial intercourse between the people of a large area. The fact that the lake goes dry is unimportant if in its ordinary state it is in fact navigable.

It appears from this record, read in the light of common knowledge, that the lands under the lake belong to the State in its sovereign capacity in trust for all the people of the State for the uses afforded by the waters under the laws of this State. This being so the patent to the State under the Act of September 28, 1850, conveyed no title to lands under the navigable waters, that enures to the appellants here.

The Trustees of the Internal Improvement Fund who have the disposal of the swamp and overflowed lands of the State have no authority to convey the title to lands under navigable waters that properly belong to the sovereignty of the State. Gerbing v. State, *supra.*

The complainant, appellee here, may have riparian rights in the land and waters opposite his riparian holdings that the law will protect, but he appears to have no title to the lands under the navigable waters. It is assumed that the meander line and the ordinary water-line of the lake are the same.

The appellants, Trustees of the Internal Improvement Fund of the State, appear to have no title to or authority to sell the lands in controversy, and the appellee does not appear to have title to the land under the navigable waters of the lake, but as the appellee appears to have riparian rights in the land in controversy, that portion of the decree enjoining the appellants from asserting any claim or title to the land and from conveying or leasing or from attempting to convey, lease or otherwise to encumber the land is affirmed, and that portion of the decree cancelling patents and adjudging that the title to. the lands between the meander lines of Lake Jackson in front of and bordering on the appellee's land and the middle of the said lake is in the appellee, is reversed. The appellants will pay one-half of the costs of this appeal and the appellee the other half.

It is so ordered.

SHACKLEFORD and COCKRELL, JJ., concur.

TAYLOR, P. J., and HOCKER and PARKHILL, JJ., concur in the opinion.