105 So.2d 584 (1958)
Elmer V. ADAMS and Esther Weber Adams (defendants) and
Neil M. Westbrook et al. (defendants joining in appeal), Appellants,
v.
John E. CREWS et al. (plaintiffs) and
Leroy Collins et al., As Trustees of the Internal Improvement Fund, and the State of Florida (Intervenors), Appellees.
No. 672.
District Court of Appeal of Florida, Second District.
October 8, 1958.
*585 Clark W. Jennings, Winter Park, Frederick J. Ward, of Giles, Hedrick & Robinson, Orlando, for appellants.
Yergey & Yergey, Orlando, Richard W. Ervin, Atty. Gen., Ralph M. McLane, Asst. Atty. Gen., for appellees.
ALLEN, Judge.
This is an interlocutory appeal from orders striking parts of the answers of the appellants who were defendants below. The plaintiffs filed an amended complaint against Elmer V. Adams and Esther Weber Adams, his wife, Neil M. Westbrook and H. Burkett Bray, Jr. and Helen Bennett, as Tax Assessor of Orange County, Florida.
The complaint alleged that the plaintiffs are the owners of property bordering on Lake Maitland in Orange County, Florida upon which they and others similarly situated, reside; that Lake Maitland is a navigable lake; that a small island of about 20 acres near the east shore of the lake is connected to the mainland by a bridge; that another small island, twenty by sixty feet, of shallow marshy land, is located about a quarter of a mile off shore, which small island is known locally as "Picnic Island"; that the defendants, Adams and wife, claim title to the submerged lands described as successors in title to former owners of the property whose title to certain property described therein reverts to the State under the Murphy Act, Laws 1937, c. 18296, F.S.A. § 192.35 et seq. and notes; that the Trustees of the Internal Improvement Fund, for the consideration of $75.00, conveyed the submerged land to one G.G. Michael Norman and wife by deed No. 182 recorded in Deed Book 555, page 263, public records of Orange County, Florida.
The plaintiffs allege further that the property so conveyed by tax deed was, on *586 the date sold and at all times prior thereto, submerged in Lake Maitland, Florida, containing 35 acres more or less; that on June 3, 1957, Norman and wife conveyed to the defendants Adams and wife the said 35 acres; that the 35-acre tract so conveyed was submerged land of Lake Maitland, a navigable body of water, title to which vested in the State of Florida in trust for the people of the State and that the purported deeds were void and of no force and effect; that the defendants Adams and wife contracted with Westbrook and Bray to fill in said submerged lands by dredging or pumping sand and soil from the lake bottom onto the submerged land lying eastwardly from Lot 1, which submerged land extends out into Lake Maitland a distance of nearly one-quarter mile, and at the time of filing this complaint, the fill had already extended 100 feet in the form of a peninsula jutting out into said lake; that the defendants Adams and wife have also filled in the island known as "Picnic Island" located approximately a quarter of a mile from the mainland, greatly increasing the size thereof; that the construction of said peninsula and island by dredging and filling in the submerged land has interfered with and obstructed the use of the waters for navigation, commerce, pleasure, recreation, health and other rights allowed by law in said waters.
Various motions and pleadings were filed in the case but are not important on this appeal. The trustees of the Internal Improvement Fund intervened in this suit on behalf of the State. The complaint of the intervenors asserted the invalidity of the tax title to the bottom lands of Lake Maitland as void at its inception and requested the court to declare and determine that the bottom lands of Lake Maitland are vested in the State of Florida in trust for the people of the state as sovereignty lands. Intervenors also requested that the defendants be permanently enjoined and restrained from further trespassing upon, using or removing soil from the bottom of Lake Maitland, and be mandatorily enjoined to replace and return all disturbed and removed soil to its former position.
Answers were filed to each complaint by the defendants Adams and wife to which motions to strike were directed by both the plaintiffs below and the intervenors.
The answers of the defendants to the complaint of the original plaintiffs, in effect, pled an estoppel along the following lines: That the dredging operations greatly beautified and made more healthful the area involved; that the original plaintiffs and other owners along the mainland had beautified by dredging along the lake; that on June 3, 1957, when the defendants purchased the lands, they did so in reliance on the fact that the shore of Lake Maitland had been subjected to similar dredging operations and that for more than seventy years the entire lake bottom under the waters of Lake Maitland had been conveyed and reconveyed as private property and taxed as such; that no claim has ever been made by the State, the trustees, or any one else that the land was not subject to private ownership; that the defendants Adams and wife had expended the sum of more than $32,000 in having plans drawn for their said home and for the dredging operation referred to in the complaint, all of which was spent before the plaintiffs or anyone else made any objection thereto; that Lake Maitland was not a navigable body of water; that none of the plaintiffs is the owner of any right, title, or interest in and to any lands bordering Lake Maitland other than those which said plaintiffs might own jointly with their respective wives as estates by the entireties, and had no right to bring the suit. The answer of Adams and wife to the complaint of the trustees of the Internal Improvement Fund included some of the matters that were set out in the answers to the original plaintiffs' complaint as to the expenditures of the defendants Adams and wife, and in addition, alleged in paragraph 10 of such answer that when the trustees conveyed the property involved to the defendants' predecessor in title, it contained no restrictions or reservations, that the trustees determined *587 as a matter of fact that said lands were not sovereignty lands but were lands capable of private ownership, and that they are estopped by such acts to now deny the same. Paragraph 11 of the answer alleges that Section 271.09 of Florida Statutes, F.S.A. provides that riparian rights are incident to lands upon navigable waters only; that navigable waters shall not be held to extend to any waters in the form of lakes, ponds, or overflowed lands lying over and upon areas which have heretofore been conveyed to private individuals by the United States or by the State without reservation of public rights in and to said waters; that since no reservations were made by the United States or the State of Florida, Lake Maitland is not a navigable body of water; and that the trustees have no right, title or interest therein as trustee for the public. Paragraph 12 of the answer alleged that if the waters of Lake Maitland are navigable, the grant of the lands under the lake was not voidable in that the use to which the defendants have put said property has been such as not to invade or impair the public interests in said sovereign lands and does not, therefore, violate the inalienable trust doctrine, and that the intervenors are, therefore, estopped to contend that the original deed is void.
We have heretofore remarked that this interlocutory appeal is from the orders of the lower court striking from the two answers of the defendants Adams and wife the paragraphs which set up defensive matters hereinbefore set forth.
We shall address our opinion primarily to the stricken parts of the answer of the defendants Adams and wife to the complaint of the Trustees of the Internal Improvement Fund since the rights of the public in and to sovereign lands are broader than those of individual owners of property bordering on navigable waters, and even if certain actions of private owners might estop them from questioning acts of transgressors on the rights of the sovereignty, such estoppel would not relate to the sovereignty.
The points involved on the appeal, as set forth in the defendants' brief, are as follows:
1. By their acts or their failure to act, the plaintiffs are estopped to assert any rights or remedies against defendants as alleged in their complaint.
2. By their acts or their failure to act the intervenors are estopped to assert any rights or remedies against defendants as alleged in their complaint.
3. Section 271.09, F.S.A., conclusively determines as a matter of law that Lake Maitland is not navigable.
4. None of the plaintiffs has such an interest in the properties bordering on the shores of Lake Maitland as entitle him to maintain this suit.
5. Even assuming that Lake Maitland were navigable in its natural state, and that it remains so, the use to which defendants have put their submerged lands has not violated the inalienable trust doctrine and the intervenors are therefore estopped to contend that their deed to said property on August 9, 1940, was void or voidable.
The defendants contend in point 3 of their brief that Section 271.09, Florida Statutes, F.S.A. conclusively determines as a matter of law that Lake Maitland is not navigable. Chapter 271, Florida Statutes, F.S.A., pertains to grants to riparian owners. Section 271.09 of said chapter defines riparian rights. Subparagraph (2) of the said section provides:
"Navigable waters in this state shall not be held to extend to any permanent or transient waters in the form of so-called lakes, ponds, swamps or overflowed lands, lying over and upon areas which have heretofore been conveyed to private individuals by the United States or by the state without reservation of public rights in and to said waters."
Paragraph (3) provided:
"The submerged lands of any nonmeandered lake shall be deemed subject *588 to private ownership where the trustees of the internal improvement fund of Florida conveyed the same more than fifty years ago without any deductions for water and without any reservation for public use and when taxes have been levied and collected on said submerged lands since conveyance by the state."
Section 271.06 provides that nothing in Sections 271.02-271.08 shall be construed to apply to lakes, except tide water lakes.
The Supreme Court, in McDowell v. Trustees of Internal Improvement Fund, Fla. 1956, 90 So.2d 715, 717, said:
"Further in connection with the issue of navigability, appellants rely on Laws of Florida 1953, § 192.61(2). By the language of this section, taken in isolation, it would appear that waters lying over `areas which have heretofore been conveyed to private individuals by the United States of America or by the State of Florida without reservation of public rights in and to said waters' are non-navigable as a matter of law. This sub-section was originally part of Chapter 28262, Laws of Florida 1953, which pertained to tax matters. See Webb v. Giddens, Fla., 82 So.2d 743, in which we mentioned another section of this act. In the 1953 Florida Statutes, the subsection was appropriately included in the chapter on taxation, and it was apparently intended by the legislature to provide a guide for the benefit of tax assessors. In Florida Statutes 1955, F.S.A., the subsection has been transferred to form a part of § 271.09, in a chapter entitled `Grants to Riparian Owners'. Before the 1955 revision is re-enacted by the legislature, however, the new position of this section cannot be considered, and even if it could it would be inapplicable hereto in view of § 271.06 which renders the entire chapter inapplicable to lakes except tidewater lakes."
We hold that no error was committed by the lower court in holding that section 271.09, Florida Statutes, F.S.A., has no application in the present case.
We believe that the primary question relied on by the appellants may be restated as follows:
Did the stricken parts of the answers of the defendants set up sufficient facts to estop the State of Florida, through the intervenors, from asserting the rights of the people of the state to sovereignty land?
The hereinafter cited cases enunciate the inalienable rights in sovereign lands that belong to the people of a state.
In one of the early cases to come before the Florida Supreme Court, State v. Black River Phosphate Co., 1893, 32 Fla. 82, 13 So. 640, 644, 21 L.R.A. 189, the Supreme Court, in its opinion, said:
"And subsequently, in Pollard's Lessee v. Hagan, 3 How. [212], 219 [11 L.Ed. 565], the supreme court decided that the shores of the navigable waters and the soils under them were not ceded by the original states through the constitution to the United States, but were reserved by the states, subject, however, to the power of the general government, under section 8, art. 1, of the constitution, to `regulate commerce with foreign nations and among the several states;' and, further, that new states admitted into the Union on equal footing with the original states have the same rights, sovereignty, and jurisdiction over all such lands within their borders. By the express provision of the act of congress of March 3, 1845, Florida was `admitted into the Union on equal footing with the original states in all respects whatsoever.' These lands must be regarded as having been withheld by the original states as essential to their sovereignty, and as having passed from the United States to the new states upon the same principle; and in *589 Pollard's Lessee v. Hagan, supra, it is also said that to give to the United States the right to transfer to a citizen the title to the shores and the soil under the navigable waters would be placing in their hands a weapon which might deprive the states of the power to exercise a numerous and important class of police powers.
"As tending to illustrate the nature of the tenure of these waters and the lands under them, including the shore, and the use for which the same are intended, it may be remarked that the right of property of the general government in other lands and waters, i.e. the uplands and nonnavigable waters and the lands under the same, in the new states, and those in the original states granted by them to the United States, (Pollard's Lessee v. Hagan, 3 How. 224,) was not affected by the attainment of statehood. Section 2, art. 4, Const. U.S.; Pollard's Lessee v. Hagan, 3 How. 224. The reason of this distinction is that this class of lands and waters, when not held for forts, magazines, arsenals, dock yards, or other needful buildings, (article 1, § 8, cl. 17, Const.,) or for public parks or similar purposes, is not held for use as such by either the government or the people, but rather to the end that they shall finally become the subject of individual or several ownership, under such processes of disposition as congress may from time to time adopt; the proceeds, in case of sale, to be used for the common welfare, according to the will of the lawmaking power. In the case, however, of navigable waters and the lands thereunder, including the shore, the chief end and purpose of their tenure is the use of such waters, lands, and shore themselves, by each and all of the people as their common property.
* * * * * *
"* * * It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks, and piers therein, for which purpose the state may grant parcels of the submerged lands; and so long as their disposition is made for such purpose no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundations for wharves, piers, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the state. But that is a very different doctrine from the one which would sanction the abdication of the general control of the state over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the state to preserve such waters for the use of the public. The trust devolving upon the state for the use of the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the state for the purpose of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interests in the lands and waters remaining. It is only by observing the distinction between a *590 grant of such parcels for the improvement of the public interest, or which, when occupied, do not substantially impair the public interests in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. General language sometimes found in the opinions of the courts, expressive of absolute ownership and control by the state of lands under navigable waters, irrespective of any trust as to their use and disposition, must be read and construed with reference to the special facts of the particular case. A grant of all the lands under the navigable waters of a state has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instances of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police power in the administration of government and the preservation of the peace." (Emphasis ours)
On page 648 of 13 So. in the Black River case, supra, it was said:
"Excluding as immaterial to the question before us all rights growing out of interstate and foreign commerce under the constitution of the United States, the result of these authorities is that at the time of the passage of our riparian act the navigable waters of the state and the soil beneath them, including the shore or space between high and low water marks, were the property of the state, or of the people of the state in their united or sovereign capacity, and were held, not for the purposes of sale or conversion into other values, or reduction into several or individual ownership, but for the use and enjoyment of the same by all the people of the state for at least the purposes of navigation and fishing and other implied purposes; and the lawmaking branch of the government of the state, considered as the fiduciary or representative of the people, were, when dealing with such lands and waters, limited in their powers by the real nature and purposes of the tenure of the same, and must be held to have acted with a due regard for the preservation of such lands and waters to the uses for which they were held."
The principles enunciated in the Black River case, supra, were affirmed in the later case of Broward v. Mabry, 1909, 58 Fla. 398, 50 So. 826, where the Supreme Court, in an opinion written by the late Chief Justice Whitfield, said:
"Under the common law of England, the crown in its sovereign capacity held the title to the beds of navigable or tide waters, including the shore or the space between high and low water marks, in trust for the people of the realm, who had rights of navigation, commerce, fishing, bathing, and other easements allowed by law in the waters. This rule of the common law was applicable in the English colonies of America. After the Revolution resulting in the independence of the American States, title to the beds of all waters, navigable in fact, whether tide or fresh, was held by the states in which they were located, in trust for all the people of the states respectively. When the Constitution of the United States became operative, the several states continued to hold the title to the beds of all waters within their respective borders that were navigable in fact without reference to the tides of the sea, not for purposes of *591 disposition to individual ownerships, but such title was held in trust for all the people of the states respectively, for the uses afforded by the waters as allowed by the express or implied provisions of law, subject to the rights surrendered by the states under the federal Constitution. The rights of the people of the states in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low water marks, relate to navigation, commerce, fishing, bathing, and other easements allowed by law. * * * The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the states. For the purpose of enhancing the rights and interests of the whole people, the states may by appropriate means grant to individuals the title to limited portions of the lands under navigable waters, or may give limited privileges therein, but not so as to divert them from their proper uses for the public welfare, or so as to relieve the states respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress. New states, including Florida, admitted `into the Union on equal footing with the original states, in all respects whatsoever,' have the same rights, prerogatives, and duties with respect to the navigable waters and the lands thereunder within their borders as have the original thirteen states of the American Union. Among these prerogatives are the right and duty of the states to own and hold the lands under navigable waters for the benefit of the people, as such prerogatives are essential to the sovereignty, to the complete exercise of the police powers, and to the welfare of the people of the new states as of the original states of the Union. * * *" (Emphasis ours.)
In Hicks v. State ex rel. Landis, 1934, 116 Fla. 603, 156 So. 603, it was stated that the state holds title to lands under navigable waters in trust for people of the state so that they might enjoy navigation, carry on commerce, and fish free from obstruction and interference of private parties.
In White v. Hughes, 1939, 139 Fla. 54, 190 So. 446, it was held that private ownership stops at the high water mark, and state holds foreshore in trust for its people for the purposes of navigation, fishing and bathing.
In Watson v. Holland, 1944, 155 Fla. 342, 20 So.2d 388, app. for extension of time to file certiorari, denied, 1945, 325 U.S. 839, 65 S.Ct. 1408, 89 L.Ed. 1965, it was held that the title to all submerged lands, whether tide or fresh, is held by the state in trust for all the people of the state, that such trust is governmental and may not be completely alienated but that, in interest of all the people, the state may grant to individuals limited privileges or rights in such lands. Also see Holland v. Fort Pierce Financing & Construction Co., 1946, 157 Fla. 649, 27 So.2d 76.
In the case of State ex rel. Ellis v. Gerbing, 1908, 56 Fla. 603, 47 So. 353, 22 L.R.A., N.S., 337, the Court, in its opinion, held that:
"The navigable waters in the state and the lands under such waters, including the shore or spaces between ordinary high and low water marks, are the property of the state, or of the people of the state, in their united or sovereign capacity. Such lands are not held for purposes of sale or conversion into other values, or for reduction into several or individual ownership, but for the use of all the people of the state for the purposes of navigation, commerce, fishing, and other useful purposes afforded by the waters thereon."
In the case of McDowell v. Trustees of Internal Improvement Fund, Fla. 1956, 90 So.2d 715, *592 717, which was tried in the lower court by the writer of this opinion, and which, factually, except for the question of estoppel, is similar to the case now before this court on appeal, the Court said:
"Since Lake Ariana is a navigable, meandered lake, the chancellor correctly ruled that title to its bottom was in the State. Broward v. Mabry, supra; Martin v. Busch, 93 Fla. 535, 112 So. 274; White v. Hughes, 139 Fla. 54, 190 So. 446. In Hicks v. State ex rel. Landis, 116 Fla. 603, 156 So. 603, 604, we said, in an opinion by Mr. Chief Justice Davis:
"`The State holds the title to lands under navigable waters in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have the liberty of fishing therein free from the obstruction and interference of private parties. The trust devolving upon the state for the public, and which can only be discharged by the management and control of the property in which the state has an interest, cannot be relinquished by a transfer of the property, or by the transfer of any special interest therein, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the waters and lands remaining. Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249.'
"See also Bucki v. Cone, 25 Fla. 1, 6 So. 160; and State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. 353, 22 L.R.A., N.S., 337. See also Baker v. State ex rel. Jones, Fla., 87 So.2d 497.
"The second basic contention of appellants is that if Lake Ariana is a meandered lake and, in fact, navigable, they were within their riparian rights to extend the lands out from the shoreline and over the bottom of the lake. This contention could be colorably maintained, on the state of facts here presented, only by reference to the `Butler Bill' which, however, excluded lakes other than tidewater lakes from its operation. See Duval Engineering & Contracting Co. v. Sales, Fla., 77 So.2d 431. Appellants cannot acquire title to sovereignty lands in this fashion."
In the case of Stein v. Brown Properties, Inc., Fla. 1958, 104 So.2d 495, 498, the Supreme Court, in an opinion by Justice Thomas, held that as to submerged lands adjacent to uplands, the seller had no marketable title since such title could not come into being until submerged land had been improved by filling and extension of the upland. This case involved a purchaser's action for a specific performance of a contract. The Court in its opinion said:
"The chancellor concluded that the `State' could not as an intervenor question the title to the 50 acres of tidal and submerged lands but would have to do so in a timely suit for that purpose inasmuch as the `State' intervened subject to the rights of the original parties. This may be true but the claim of the Trustees did present issues very material to a determination of the rights of the contracting parties. In any event, we have held that even when there is no intervention by the State and it is apparent to the court that the right of the State to land in litigation is involved, the court must take cognizance of such right. Williams v. Guthrie, 102 Fla. 1047, 137 So. 682.
* * * * * *
"In commenting upon these features of the controversy we do not express an opinion that the tide and submerged lands are of such character or location that they have been or are affected by any of the acts of the legislature dealing with the rights of upland owners in adjacent submerged or tidal lands.

*593 "We come now to the question whether or not some special right came to the appellee because the property was conveyed to its predecessor in title by patent from the government, a point in the intervenors' brief to which we have already referred. It is shown on the plat that most of the government lot is either under the Atlantic Ocean or is washed by the tides.
"The appellant concedes that appellee's predecessors received marketable title to the upland by patents, in 1882 and 1883, the United States Government having been ceded lands above high tide by treaty with the King of Spain in 1821, 8 Stat. 252. Title to tidal lands became vested in the State of Florida upon its becoming a member of the Union 3 March 1845, 5 Stat. 742, subject, of course, to right of Congress in respect of the requirements of navigation. Under the common law of England the crown held title to the bottoms of navigable and tidal waters, and to the foreshore, in trust for the people and this rule applied to the colonies and private rights extended only to the high-water mark. This was the rule under the Spanish Law as well. Brickell v. Trammell, 77 Fla. 544, 82 So. 221.
"In the opinion in that case filed in 1919, we find the significant statement that `those claiming ownership below high-water mark must show the sources and muniments of title from competent authority to make such a grant against the rights of the public in the shores and waters of navigable waters in this state.'
"The Supreme Court of the United States held in Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 570, 38 L.Ed. 331, that `(g)rants by congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state when created * * *.' In that case the appellant had received from the federal government land bounded by the Columbia River. Later the land was included in the boundaries of the State of Oregon. Even though the appellant's vesting of title from the government preceded admission of the State to the Union, his title to land below high-water mark was held subordinate to that of the State.
"It seems to follow that by the patents from the federal government to appellee's predecessor in title no peculiar right was obtained to that part of the land under the ocean or under tidal waters as the land below the high-water mark was sovereignty land. Trustees of Internal Improvement Fund v. Claughton, Fla., 86 So.2d 775. Actually, appellee concedes in its brief `that when Florida was admitted to the Union in 1845, it acquired title to the foreshore and submerged lands involved in this litigation.'
* * * * * *

"The appellee has advanced the argument that some sort of estoppel should be marked against the State because for many years taxes have been levied and collected on all the property, up land, tidal and submerged. We do not understand how application of the doctrine could, under the circumstances peculiar to this dispute, work a marketable title in appellee, but we do not pursue the matter because it does not appear to have been entertained by the chancellor." (Emphasis ours)
We find no error of the lower court in striking various parts of the answers of the appellants, defendants below.
Affirmed.
KANNER, C.J., and DICKINSON, JOHN, Associate Judge, concur.