341 So.2d 977 (1976)
Howard ODOM et al., Etc., Appellants,
v.
The DELTONA CORPORATION, Appellee.
BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND, Appellant,
v.
The DELTONA CORPORATION, Appellee.
Nos. 46980, 47086.
Supreme Court of Florida.
November 30, 1976.
As Corrected On Denial Of Rehearing February 15, 1977.
*979 Robert L. Shevin, Atty. Gen., and Kenneth F. Hoffman, Asst. Atty. Gen., for Game and Fresh Water Fish Commissioners, and Ross A. McVoy, Asst. Gen. Counsel, Tallahassee, and John R. Boehm, Research Associate, Daytona Beach, for Bd. of Trustees, Internal Improvement Trust Fund, appellants.
L. Grant Peeples and William L. Earl, of Peeples, Earl & Blank, Miami, for appellee.
William A. Leffler, III, Sanford, Frank A. Ford, Bartow, and William E. Sherman, of Landis, Graham, French, Husfeld, Sherman & Ford, DeLand, and Robert Bruce Snow, Brooksville, for amici curiae.
BOYD, Justice.
In this matter we are reviewing a direct appeal[1] from the Circuit Court of the Second Judicial Circuit of Florida in and for Leon County. The judicial reasoning and clarity of the trial court's opinion is of such nature that we consider it advisable to publish it in its entirety followed by our own observations.

"FINAL SUMMARY JUDGMENT
"This cause came on for consideration of the Plaintiff's Motion for Summary Judgment and the Court having considered the pleadings, affidavits, depositions, admissions, and all other papers and documents filed in the cause, and having read the briefs and memoranda of counsel and heard arguments, and being otherwise advised, it is
"ORDERED, ADJUDGED AND DECLARED:
"1. The said motion is found to be well taken, as there is no genuine issue of material fact and the plaintiff is entitled to judgment as a matter of law to the extent herein declared.
"2. This is an action for declaratory and injunctive and other relief against the defendant Board of Trustees of the Internal Improvement Fund (hereafter referred to as `Trustees') and Game and Fresh Water Fish Commission (hereafter referred to as `Commission'). The Attorney General was permitted to intervene. The plaintiff will be referred to as `Deltona'. The issues involved the respective rights and duties of the parties in the areas of certain nonmeandered lakes or ponds located within the perimeter of lands in Volusia and Hernando Counties to which Deltona has or had paper title in connection with the development of communities known as Deltona Lakes Subdivision (Volusia County) and Spring Hill Subdivision (Hernando County). Deltona Claims to own the lakes in question under various chains of title originating either in U.S. Patents or deeds of the Trustees of land acquired by the state under the Swamp and Overflow Lands Grant Act of September 28, 1950 [sic]. The Trustees claim that the lakes are the waters, beds and shores of navigable waters which are held by the state in trust for the public by virtue of the state's sovereignty. The controversy arises out of certain activities of *980 Deltona to develop the lands for community purposes which involves certain drainage, dredging and other alterations to the shores, bottoms and waters of certain of the lakes. The Trustees and the Commission, through their officers and agents, have sought to interfere with such activity contending that such are violations of F.S. 253.123, 253.124 and F.S. 370.035 because of lack of permits required, and the development of the lake areas will interfere with the environmental ecology and conservation of natural resources.
"3. The real question involved is the status of such lakes as to whether they are the private property of Deltona or are vested in the state as sovereignty lands in trust for the people.
"4. By stipulation, confirmed by Order dated June 26, 1974, the defendants and the Intervenor Attorney General have waived and released all claims or assertions of jurisdiction, except certain reservations of mineral rights and road rights of way, in the properties described below:
"(a) Hernando County:
Sections 1, 2, 11, 12, 22, 25, 26, 31, 34 and 35, Tp. 23 S, R 17 E; Sections 4, 5, 6, 7, 8, 9, 15, 17, 18, 19, 20, 21, 22, 27, 28, 29, 30 and 34, Tp. 23 S, R 18 E; those portions of Sections 13, 14, 23, 24, 27, 28, 29, 32 and 33 Tp. 23 S, R 17 E not within the defined perimeters and which do not constitute shoreline of or about certain bodies of water known as Hog Pond, Hunter's Lake, and Weekiwachee Prairie Lake, according to the Official United States Government Quad Map.
"(b) Volusia County:
Sections 2, 3, 8, 11, 12, 13, 17, 18, 19, 20, 24, 25, 28, 29, 30, 31, 32, 33, Tp. 18 S, R 31 E; Sections 24, 25 and 36, Tp. 18 S, R 30 E; Sections 5 and 6, Tp. 19 S, R 31 E; those portions of Sections 9, 10, 14, 15, 21, 22, 23, 26, 27, 34, 35, 36, Tp. 18 S, R 31 E, and those portions of Sections 1, 2, 4, 11, Tp. 19 S, R 31 E, not within the defined perimeters and which do not constitute shoreline of or about certain bodies of water known as Three Islands Lake, Dupont Lake, Theresa Lake, Louise Lake, Big Lake, Lake Hutchinson, Elizabeth Lake, Anne Marie Lake, Sidney Lake, Diana Lake, and portions of Lake Butler Chain according to the Official United States Government Quad Map.
Therefore, this judgment pertains only to such areas and properties not included in the above described land.
"5. It is undisputed that all of the lands have been government surveyed and the official surveys did not meander any of the lakes involved. It is also established that all the area of the lakes is included within the perimeters of the lands described in U.S. Patents and Trustees' deeds to grantees who became private owners and that no reservations were made for public use and no deductions for water were included. Most of these instruments were executed prior to the turn of the century, but some were as late as 1952. It also is not contested that Deltona and its predecessors in title have paid the taxes levied on these properties and that they have been vested with the fee simple paper title of record for more than 30 years and that there is nothing of record purporting to divest them of such an estate.
"6. The rights of the defendants to interfere with the lakes in the area is based upon a claim that the lakes involved are navigable bodies of water and that the shore, bed and waters are held by the Trustees, as agents of the state, as sovereignty lands of the state in trust for the public.
"7. It is clearly established as the law in this jurisdiction that by virtue of its statehood, Florida holds the title to the waters, shores and beds of all navigable waters in trust for the people for the purposes of navigation, commerce, fishing, bathing and other easements allowed by law in the water. Such trust is governmental and cannot be wholly alienated, but by appropriate means there may be granted to individuals titles to limited portions or there may be given limited privileges so long as it does [not] divert them from their proper use for public welfare or relieve the state of its control and regulation. Broward v. Mabry, 58 Fla. 398, 50 So. 826; State v. Black River *981 Phosphate Co., 32 Fla. 82, 13 So. 640. It is also recognized that properties acquired by the state under the Swamp and Overflow Grant Act of 1850 do not cover or include lands under navigable waters as such were already held by the state in trust by virtue of sovereignty, State v. Gerbing, 56 Fla. 603, 47 So. 353 (1908) and a deed from the Trustees of I.I. Fund purporting to convey lands acquired under the 1850 Act of Congress would not convey sovereignty lands. Martin v. Busch, 93 Fla. 535, 112 So. 274. These principles have been consistently recognized and applied and are not to be doubted. However, whether or not a particular area is that of a navigable body of water and thus sovereignty property held in trust is a question of fact and dependent upon whether or not the body of water is permanent in character and, in its ordinary and natural state, is navigable for useful purposes and is of sufficient size and so situated and conditioned that it may be used for purposes common to the public in the locality where it is located. Broward v. Mabry, supra. See also Bucki v. Cone, 25 Fla. 1 [6 So. 160] and Clement v. Watson, 63 Fla. 109, 58 So. 25.
"8. It is to be noticed that navigable waters and their shores and bottoms are in a number of dissimilar forms such as seas, bays, tidewater inlets, rivers, and lakes. Particular difficulty arises in reference to fresh water lakes whose size, depth and relationship to other water bodies vary from a body like Lake Okeechobee of a vast area to bodies variously referred to as ponds, sloughs, and lakes which contain relatively few acres and which may vary considerably from time to time depending upon rainfall and other natural influences. The legal tests of navigability are at best broad guidelines and it is not surprizing that so many disputes have arisen on this issue. As it is equally well settled that non-navigable bodies are subject to private ownership, Pounds v. Darling, 75 Fla. 125, 77 So. 666; Clement v. Watson, supra; Baker v. Jones (1956) 87 So.2d 497, there is often the conflicting claim of private owner and that of the state, as trustee, to the same area. Also, the riparian rights and limitations of owners of lands bordering on navigable waters or claims that such rights exist have been the subject of much controversy when the fact of navigability is an issue.
"9. The basis of the title status of sovereignty lands rests initially on the common law of England under which the Crown held the title to the beds of navigable and tide waters, in trust for the people of the realm who had rights of navigation, commerce, bathing, and fishing and other recognized easements. This rule was applicable to the English colonies and after the Revolution resulting in independence of the American states, title to the beds of all waters, navigable in fact, was held by the states in which they were located in trust for all the people of the states respectively. When the U.S. Constitution became operative the several states continued to hold such title in trust subject to rights surrendered to the federal government under the Constitution. When the Floridas were acquired from Spain such territory became subject to the Constitution and laws of the United States, and when Florida was admitted to the Union as a state it expressly acquired the same rights and duties that the original states have. Broward v. Mabry, supra. The last cited case repeatedly refers to sovereignty lands as the beds of waters `navigable in fact'. As the sovereignty title arose contemporaneously with the status of statehood, the sovereignty lands are the beds and shores of waters then `navigable in fact'. Waters not then, in their natural state, navigable in fact afforded no basis for its area being sovereign trust lands. Consequently, in any event the true test is natural navigability or capable navigability at the time statehood was acquired in 1845. Bodies of water which become navigable by artificial means are not converted from private ownership into sovereignty lands. Clement v. Watson, supra.
"10. The sovereignty lands held by the state under common law principles is confirmed in the Constitution of 1968, which states, in pertinent part:

*982 `Sovereignty lands  The title of lands under navigable waters, within the boundaries of the state, which have not been alienated, ... is held by the state, by virtue of its sovereignty, in trust for all the people... .' (Emphasis supplied.)
"11. The legislature has sought by various enactments to shed some light on the subject of navigable waters and what is included therein. Section 197.228, Florida Statutes, seeks to define riparian rights in subsection 1. Such rights `are those incident to land bordering upon navigable waters'. (Emphasis supplied.) In subsection 2 it is provided:
`(2) Navigable waters in this state shall not extend to any permanent or transient waters in the form of so-called lakes, ponds, swamps or overflowed lands, lying over and upon areas which have heretofore been conveyed to private individuals by the United States or by the state without reservation of public rights in and to said waters.'
In subsection (3) it is further provided:
`(3) The submerged lands of any non-meandered lake shall be deemed subject to private ownership where the trustees of the internal improvement trust fund of Florida conveyed the same more than fifty years ago without any deductions for water and without any reservation for public use and when taxes have been levied and collected on said submerged lands since conveyance by the state.'
This statute is at pains to recognize conveyances by governmental authority purporting to transfer to private ownership a described area as effective to include lakes, ponds, swamp and overflow land unless the instrument makes a reservation of them. It also makes a special treatment of nonmeandered lakes when the trustees make conveyance of lands vested in it. Chapter 253, Florida Statutes, deals with the Internal Improvement Trust Fund. Section 253.12(1) specifies the lands which are vested in the trustees of the fund. It includes:
`Except submerged lands heretofore conveyed by deed or statute, ... all sovereignty ... submerged bottom lands ... located in the navigable waters, and including ... all submerged lands owned by the state by right of its sovereignty in navigable fresh water lakes... .' (Emphasis supplied.)
It further provides:
`Submerged lands owned by the state by right of its sovereignty in navigable meandered fresh water lakes shall be administered in accordance with the provisions of Section 253.151... .' (Emphasis supplied.)
Section 253.151 deals with the control and management of navigable meandered fresh water lakes. It provides:
`(1) The submerged lands located under navigable meandered fresh water lakes shall be considered as a separate class of sovereignty lands. Such separate class of sovereignty lands shall not be construed to be of the same character as tidal lands, streams, watercourses or rivers or as lakes attached to tidal waters by means of navigable watercourses, but, rather shall be administered in accordance with the provisions of this section.'
Subsection (3) provides criteria for the establishment of boundary lines separating the sovereignty lands from those of the riparian upland owner. The boundary is to be ascertained, if possible, `as of the date such body came under the jurisdiction of the state'. Subsection 3(a). Subsection (7) states:
`Nothing contained in this section or section 253.12(1) shall be construed as affecting privately owned lakes, streams, watercourses, or submerged lands.'
The existing constitutional provision relating to sovereignty lands refers to such lands under navigable waters, `which have not been alienated'. Article 10, Section 11, Florida Constitution 1968.
"12. The statutes under particular attack here and under which the defendants assert their rights and duties to interfere with Deltona's activities are Section 253.123 and 253.124. Section 253.123(1) provides that no private entity shall construct islands *983 or add to or extend existing lands or islands `bordering on or being in the navigable waters of the state as defined in Section 253.12 by pumping sand, rock or earth from such waters or by any other means' without first complying with the fixing of bulkheads under Section 253.122. Subsection (2) deals with removal of sand, rock and earth from navigable waters by dredging, pumping, digging or otherwise which is prohibited, except for certain limited purposes, and subsection 3 requires that before most of such authorized works are undertaken, a permit must be obtained from the Trustees. Section 253.124 requires the obtaining of construction permits for filling or the pumping or dredging from navigable waters from the county commissioners of the county if location is in an incorporated area and from the municipality involved if in an incorporated area. Such permits are to be issued only if the proposed activity will not be harmful to the natural flow of the navigable water, will not contribute to erosion, channel shoaling, or stagnation nor harm to adjoining land, and will not interfere with conservation of fish, marine and wildlife or other natural resources, and other public interests. Subsection 5 makes criminal violations of the section. There are other provisions relating to procedures with regard to filling and dredging.
"13. It is of considerable significance that Section 253.151 singled out `meandered fresh water lakes' for special treatment, and specified with particularity that same are not to be construed to be of the same character as tidal lands, streams, watercourses or rivers or as lakes attached to tidal waters. Subsection (1). No specific mention is made of nonmeandered fresh water lakes, but subsection (7) does exclude from the operation of the section `privately owned lakes, streams, watercourses and submerged lands'. The object of the section is to properly set boundaries of sovereignty lands in fresh water lakes and to otherwise deal with their management and use. The absence of any reference to nonmeandered `navigable' fresh water lakes, together with mention of privately owned lakes as being excluded, is indicative of a legislative assumption that nonmeandered lakes are not to be regarded as navigable. Also, it is not mere surplusage that Section 253.12(1) at the very outset excluded from its operation `submerged lands heretofore conveyed by deed or statute', nor are the words `which have not been alienated' in Constitution Article 10, Section 11 without meaning. There is a clear recognition that when a specific area has been described in a valid conveyance from the public domain the state will not nullify and frustrate the effect of such conveyances. All such conveyances are with reference to official surveys and such surveys become a part of them. If there is shown a meandered lake there is notice of such a body of water and if it is navigable it is sovereignty land. If not meandered, the surveyor did not regard it as of importance. It is shown that the first Manual issued to the public surveyors in 1855 directed them to meander `all lakes and deep ponds of the area of 25 acres and upwards; also navigable bayous'; (Emphasis added). There are also specific instructions on the meandering of `navigable' streams. Both banks are directed to be meandered by `taking the courses and distances of their sinuosities, and the same are to be entered in the field book'. It was further directed that `shallow ponds, readily to be drained, or likely to dry up, are not to be meandered'. It is thus quite indicative that navigable bodies of water were to be the concern of surveyors who were directed to properly survey them out and record same on their maps and in their field notes.
"14. With greater clarity is the legislative declaration in Section 197.228(2) that `navigable waters' shall not extend to either `permanent' or `transient' water which appear `in the form of so-called lakes, ponds ... lying over and upon areas' when such areas had previously been conveyed into private ownership by either the United States or by the state, `without reservation of public rights in and to said waters'. Section 197.228(3) went further and dealt specifically with nonmeandered lakes by setting at rest the title to any such area which the Trustees had deeded more than fifty *984 years ago without any reservation for public use and when taxes had since been levied and collected. It is here noticed that all of the nonmeandered lakes involved here had been included in conveyances out of either the United States or the Trustees so as to come within the exclusion of Section 197.228(2). Most, but not all, of the Trustees deeds have been more than fifty years on record. Therefore not all of the areas would come within Section 197.228(3). However, the statute does reveal a legislative concept that nonmeandered lakes do have a significance that meandered lakes would not have in the determination of whether or not a particular body of water is navigable.
"15. It is not overlooked that the public trust in sovereignty lands which the state owns may not be divested by the legislature or other state agency. However, navigability vel non of bodies of water are questions of fact to be resolved under state authority. These statutes are not legislative conveyances of such trust properties, but rather the establishment of certain conclusive presumptions and limitations of claims. There is a recognition in Section 197.228(2) that an unconditional conveyance by the state or national government of a described area to private ownership without a specific reservation is in itself a contemporaneous finding that such area is not sovereignty property and that such finding should not be questioned. The actions of duly constituted authority are recognized as entitled to be regarded as based on a proper exercise of powers conferred and not a usurpation or other illegal conduct. The Court is urged to consider the acts of the government surveyors as not what they did but what they should have done and it is suggested that they took lightly the numerous lakes and ponds they encountered because they were not considered valuable or significant. This Court is in a poor posture to evaluate the work of those surveyors of many decades past. It can only be accepted that they did their job as instructed and recorded what they found then, which may or may not be what appears now. Fresh water lakes and ponds do change rather significantly because of both natural and artificial alterations in the areas involved. It is to be observed that governmental conveyances were made in reliance on them and the grantees of such conveyances had the right to assume the U.S. government and the Trustees were acting lawfully. Also, in 197.228(3) it is recognized that if the official surveyor did not see fit to meander a lake it must not have been of such character as to constitute a navigable body at the time of the survey. It further assumes that if the trustees undertake to convey the area without deducting for water or making a reservation then a navigable body must not have been there. If taxes are levied and collected the tax authorities recognized the private ownership. The specification of 50 years intervening between the deed and the claim and the levy and collection of taxes for that period is in the nature of a statute of limitations.
"16. Considering all of these statutory and constitutional expressions, all of which are consistent, it is made to appear that nonmeandered lakes and ponds are not to be classified as navigable bodies of water. The legislature seems to recognize the obvious fact that with the passage of much time and the many changes which take place with the normal development of most areas of the state it may be difficult and speculative to attempt to prove or disprove that a particular fresh water area was `navigable in fact' in its natural state when conveyances were made which could be fully effective only if the waters involved were not navigable. The criteria provided in the statutes to establish the nonnavigability is reasonable and practical and the Courts are bound to apply them. These provisions are not a diversion of trust properties, but an exercise of the power of the state to police against belated claims and to settle uncertainties of status of certain fresh water areas in which private owners have muniments of title purporting to confer valid unconditional ownership. Though the statutes are not specifically mentioned in the Court's opinion, their principles were applied in Osceola County v. Triple E Development *985 Co., Fla. 1956, 90 So.2d 600, with a resulting finding that certain lakes were nonnavigable and privately owned.
"17. Another concept of the mentioned statutes is the recognition of legal or equitable estoppel, or both, against the state and the public to assert a claim in properties which have been dealt with within the terms of the statutes. That the state and its agencies may be estopped to assert claims in lands in which they have a basis of ownership was bluntly stated by the Supreme Court in Daniell v. Sherrill, (Fla. 1950) 48 So.2d 736, and in Trustees of I.I. Fund v. Lobean, (Fla. 1961) 127 So.2d 98, which upheld the First District Court of Appeal in Lobean v. Trustees, etc., 118 So.2d 226. The factual situations in those cases in which estoppel was applied are similar to those which the statutes recognize as a bar to claim.
"18. The case of McDowell v. Trustees, Fla. 1956, 90 So.2d 715, has not been overlooked. This case does hold that the provisions of what are now subsection 2 of Section 197.228, Florida Statutes 1973, but were formerly Section 192.61(2), Florida Statutes, 1953 and were later included in Section 271.09(2), Florida Statutes 1955 and in Section 197.315(3), Florida Statutes 1969 and 1971 were inapplicable to fresh water lakes. The inclusion of this provision in Chapter 271 in 1955 rendered it then inapplicable to fresh water lakes, because of Section 271.06 which specifically stated: `nothing in this chapter shall be construed to apply to lakes, except tide water lakes.' Such is not the statutory posture now. Also, the case of Adams v. Crews, 2 DCA 1958, 105 So.2d 584 is deemed to have been superseded and overruled by the Lobean case above mentioned. Adams v. Crews held that there was no estoppel against the state from asserting invalidity of a tax title and from asserting rights of the people in submerged lands.
"19. Also, it is contended that the provisions of the Marketable Record Title Act, Chapter 712 Florida Statutes 1973, serve to confirm the plaintiff's title and to extinguish any claim of sovereignty land status. It is not disputed that the plaintiff together with its predecessors in its claims of title to these lands have been vested with the fee simple paper title of record for more than thirty years and that there is nothing of record purporting to divest the plaintiff or any of its predecessors of such estate. Under Section 712.02 this would constitute the title of plaintiff to be free and clear of all claims `except the matters set forth as exceptions to marketability in Section 712.03'. The exceptions in F.S. 712.03 include (1) estates, easements and restrictions `disclosed by and defects inherent in' muniments of title on which the claimed estate is based beginning with the root of title (title transaction recorded thirty years purporting to create or transfer the estate claimed); (2) estates or charges preserved by filing proper notices in accordance with Section 712.05 and .06; (3) rights of persons in possession; (4) claims based on record transactions subsequent to effective date of root of title; (5) recorded or unrecorded easements and similar interests `so long as same are used'; and (6) rights of persons in whose name the land is assessed for certain periods. It is apparent that the defendants' claims do not come within the scope of the exceptions specified. Section 712.04 provides for the extinguishment `of all estates, interests, claims or charges ... the existence of which depends upon any act, title transaction, event or omission that occurred prior to the effective date of the root of title. All such estates, interests, claims or charges, however denominated, whether [they] are held or appear to be held or asserted by a person ... natural or corporate, or is private or governmental, are hereby declared to be null and void, except that this chapter shall not be deemed to affect the right, title or interest of ... Florida or any of its officers, boards, commissions or other agencies reserved in the ... deed by which... Florida or any of its agencies parted with title'.
"20. The case of Sawyer v. Modrall, 4 DCA 1973, 286 So.2d 610, certiorari denied by Supreme Court in Modrall v. Sawyer, Fla. 1974, 297 So.2d 562, despite a vigorous *986 dissent by Justice Ervin, is dispositive adversely of the contention of defendant that claims of sovereignty are not extinguished by the operation of this Act. The facts in that case and those now before this Court in this case are similar and applicable principles are not distinguishable. On the authority of those cases it is held that plaintiff is entitled to summary judgment because of the application of the Marketable Record Title Act, as well as the other statutory provisions previously mentioned.
"21. The foregoing declarations are fairly dispositive of the issues. However, the plaintiff has raised a number of other points which are pertinent and which will be dealt with. Also, the Court deems it must comment on the great concern of the defendants with the so-called Butler chain of lakes in Volusia County of which it is said that some of the lakes in question are a part of this chain. It is shown that at certain periods waters from some of these lakes move into the chain which courses eventually into Lake Monroe in the St. Johns River basin. Development by Deltona is said to greatly disturb the clarity of the waters and will adversely affect the fish ecology as well as other wildlife such as wading birds which are features of this chain of lakes. The issues in this case involve the status of the lakes involved as being private property or sovereignty lands under the control or supervision of the defendants. Questions of pollution or damage to other property or to other public areas are not involved. If there are actions of Deltona which may be the subject of public or private claims of wrong which are not dependent upon the status of sovereignty title to the nonmeandered lakes on its property, this case is of course not dispositive of such claims. Also, the fact that the waters of these lakes may in some way and at some times move into other bodies of water does not change the nature of the individual bodies of waters as nonnavigable. Baker v. Jones, Fla. 1956, 87 So.2d 497 involved a nonnavigable arm of a navigable lake. See also Clement v. Watson, 63 Fla. 109, 58 So. 25.
"22. The plaintiff urges that in any case the factual test of navigability to be applied is the so-called federal title test, as this is a federal question. Such was the holding in United States v. Holt State Bank, 270 U.S. 49 [, 46 S.Ct. 197, 70 L.Ed. 465] (1926). This is a strict test of a water body's capacity for commercial use in its natural and ordinary condition. This was stated in United States v. Utah, 283 U.S. 64 [, 51 S.Ct. 438, 75 L.Ed. 844] (1931) wherein certain rivers were said to be navigable in fact and law `when they are used or are susceptible of being used in their ordinary condition as highways for commerce over which trade and travel are or may be conducted in the customary modes of trade or travel on water'. Our Florida decisions are not out of harmony with this rule, though there is considerable dicta in some of the cases which refers to fishing, boating, bathing and other uses of navigable waters as being a right of the public. Such dicta would suggest that not merely commerce or travel must be an actual or adaptable use but that general recreational capacities may constitute a body as navigable. However, a close study of the cases does not reveal an inconsistency with the federal title test, but rather the references to recreational uses are that such uses may be made in bodies of water which are in fact navigable for commercial or travel purposes. A suggestion was made in Justice Ervin's dissent in Silver Blue Lake Apartments v. Silver Blue Lake H.O. Assn. (Fla. 1971) 245 So.2d 609 that a recreational test may be the more enlightened rule and that a recreation oriented state like Florida might well be so persuaded. However, this opinion did recognize that Florida had not yet adopted such a test.
"23. It is also contended that the criminal prohibitions of Sections 253.124 and 370.035 are unconstitutionally vague and are therefore void. It has been held that a statute which either forbids or requires the doing of an act `in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law'. Brock v. Hardie, 114 Fla. 670, 154 So. 690 (1934); State v. Buchanan, *987 Fla. 1966, 191 So.2d 33; and Smith v. State, Fla. 1970, 237 So.2d 139. The criminal provisions of these statutes depends upon activities, such as filling, dredging and pumping, in areas bordering on or being in the navigable waters of the state and in failing to get permits for same. With regard to nonmeandered lakes no specific legislative definitions or guidelines are set forth to ascertain what is `navigable'. As already mentioned the Court is of the view that nonmeandered lakes are to be regarded as nonnavigable. However, if the appellate court or courts shall determine otherwise then the question of unconstitutional vagueness is a vital issue. It would seem to suffice to note the differences of opinion which have been brought out in this case of what is a reliable test of navigability of a fresh water lake. There is some contention that navigability may be ascertained simply by whether or not a fishing boat might easily move upon the waters. Others claim that much more is required. At any event whether or not a particular nonmeandered lake or pond is `navigable' involves a term so vague that men of common intelligence must guess at its meaning and differ honestly as to its application. This being so the provisions of the statutes which seek to define a crime and prescribe punishment for its commission are void as a denial of due process of law. Criminal provisions must be strictly construed and courts may not supply omissions from the statutes to make them operative. State v. Barquet, Fla. 1972, 262 So.2d 431.
"24. The Court deems that the foregoing is a full and sufficient declaration of rights and liabilities of the parties involved and that they may govern themselves accordingly. In accordance with a long established policy of this Court it will be assumed that the defendant state officers and agencies will abide by authoritative judgments of a court of competent jurisdiction or by those of appellate courts upon an appeal or other review of such a judgment. Consequently, no coercive or injunctive writ or command will be issued unless the need for same shall arise in the future, and jurisdiction for same is reserved. However, this reservation of jurisdiction is not to be construed as constituting this judgment other than a final judgment wherein judicial labor is completed subject only to such post judgment procedures as may be required to give effect to the pronouncements herein made.
"DECLARED, ORDERED AND ADJUDGED in Chambers at Tallahassee, Florida this 29th day of January, A.D. 1975.
 /s/ Ben C. Willis
 BEN C. WILLIS, CIRCUIT JUDGE"
We have carefully examined the record, the pleadings and Appellants' arguments. While we find the latter to be meritorious, they are without sufficient legal basis to authorize us to modify or quash the trial court's judgment and the opinions stated therein.
It is historically recognized in this country that the state and federal governments can regulate uses of both land and water areas in such matters as zoning, safety regulations and other uses of property. Specifically, the State of Florida has the inherent police power to enact such standards and regulations as may be necessary for the public interest relating to the use and development of all public and private water areas within the State of Florida, subject to such authority as may be specifically reserved in the federal government. The state may require private owners to secure permits for modifications of lake bottoms and contiguous areas which may be required for the public interest according to reasonable and uniform standards. It is equally well recognized that this state regulation must be accomplished in a constitutionally permissible manner.
The complex nature of the whole problem of navigable waters has created much doubt and controversy in attempting to determine what is or is not navigable water and sovereign land. Not only has the Legislature addressed itself to this problem and enacted at various times the statutes referred to by the trial court, but the 1968 Constitution, Article X, Section 11, acknowledges, in pertinent part, that certain sovereign lands have been alienated:

*988 "Sovereignty lands  The title of lands under navigable waters, within the boundaries of the state, which have not been alienated, ... is held by the state, by virtue of its sovereignty, in trust for all the people... ." (emphasis supplied)
If a standard other than that which has been expressed by statute and by the Constitution is proper, then it is the duty of the people and the Legislature, not the courts of Florida, to make this determination. There still remains much confusion in these matters, as is reflected by the record: for instance, trial testimony of state employees handling the issuance of dredge-and-fill permits indicates that even they are unable to determine what is or is not a navigable body of water, and one witness testified that he might be fired if he offered an opinion on the subject to a landowner seeking a permit. Further clarifying legislation might be appropriate.
Appellants assert that, since Florida became a state in 1845, the Trustees of the Internal Improvement Fund have held title to sovereign lands beneath the navigable waters of Florida, particularly those beneath fresh navigable waters, and that the federal test of "navigability in fact" is the proper test. Navigability at law is generally a question of navigability in fact;[2] and, while differing legal tests of navigability are applied for varying purposes, we agree that the issue of whether a particular lake was navigable at the time of Florida's admission to the Union so as to vest sovereignty title in the state is a federal question which, because of the need for uniformity must be determined under federal standards of navigability:[3] (1) commerce clause test;[4] (2) admiralty jurisdiction test;[5] and (3) the federal title test.[6] A critical distinction between the federal title test and the other two tests is that the title test does not allow for the consideration of reasonable artificial improvements; instead, navigability under this test is based on the water body's potential for commercial use in its ordinary and natural condition.[7] We find that Florida's test for navigability is similar, if not identical, to the federal title test.[8]
Appellants also argue for the application of the "notice of navigability" concept, i.e., that the grantee of swamp and overflowed lands under a Trustee deed takes with "notice" that the conveyance does not include sovereignty land. In the case of a large lake, such as Lake Okeechobee, a 500,000 acre lake, we agree;[9] however, it seems absurd to apply this test to small, non-meandered lakes and ponds of less than 140 acres and, in many cases, less than 50 acres in surface.
Appellants contend that the trial court made a distinction between meandered and non-meandered fresh water lakes without a factual or lawful basis for such distinction. Nevertheless, as the trial court observed, at this late date we are not in a position "to evaluate the work of those surveyors of many decades past" and can merely accept their work as correct, particularly since the state itself has relied upon it constantly since it was completed. In Florida, meandering is evidence of navigability which creates a rebuttable presumption *989 thereof.[10] The logical converse of this proposition, noted by the lower court, is that non-meandered lakes and ponds are rebuttably presumed non-navigable.[11] The lower court's treatment of meandering is also in accord with the proposition that a water body should be regarded as being non-navigable absent evidence of navigability.[12]
An examination of the Constitution and statutes indicates that both the people and the Legislature strongly feel that valid federal and state grants of title to real property without any reservation of public rights in and to waters thereon should not be upset because of new standards of value relating to ecology and other matters created by population growth, recreational needs and other issues of current importance to Florida. In fact, the Commission's assertion of regulatory authority does not comport with existing state law; this Court has delineated rather forcefully the absence of public rights, including fishing, in privately owned lakes.[13] It seems logical to this Court that, when the Legislature enacts a Marketable Title Act, as found at Chapter 712, Florida Statutes, clearing any title having been in existence thirty years or more, the state should conform to the same standard as it requires of its citizens; the claims of the Trustees to beds underlying navigable waters previously conveyed are extinguished by the Act.[14] Stability of titles expressly requires that, when lawfully executed land conveyances are made by public officials to private citizens without reservation of public rights in and to the waters located thereon, a change of personnel among elected state officials should not authorize the government to take from the grantee the rights which have been conveyed previously without appropriate justification and compensation. If the state has conveyed property rights which it now needs, these can be reacquired through eminent domain; otherwise, legal estoppel is applicable and bars the Trustees' claim of ownership,[15] subject to rights specifically reserved in such conveyances.
It appears that public officials operating under a color of law have acquiesced in the development of the land surrounding the chain of inland lakes over which this litigation arose, indicating willingness for residential development contiguous to the waters, including necessary modification of lake bottoms. Many private persons have contracted with Appellee relying upon this development, and we feel it highly inequitable and inappropriate for the state at this late date to renounce its earlier action taken under the direction of prior officials. We feel that equitable estoppel is properly invoked in this particular set of circumstances.[16]
In the trial court's judgment reference was made to Section 253.151, Florida Statutes. Although we have recently held this section of the statutes to be unconstitutional,[17] the trial court's reliance on same does not affect the conclusion and results in this opinion.
It should be reiterated that, as stated in Sawyer, supra, ancient conveyances of sovereign lands in existence for more than thirty years, when the State has made no *990 effort of record to reclaim same, clearly vests marketable title in the grantees, their successors or assigns and the land may be recovered only by direct purchase or through eminent domain proceedings.
Due to the complex nature of this problem, as more fully set forth in the trial court's opinion and judgment, and the difficulty observed in the record regarding the interpretation of the statutes and Constitution, we feel the learned trial judge was correct in determining that the criminal statute against ecological invasion is unconstitutionally vague in its present form. We feel that the Legislature might address itself to the problem and establish appropriate guidelines and criteria within the Constitution. Although the statute is apparently based on an assumption by the Legislature that meandering of fresh water lakes denotes navigability, this assumption is not necessarily a conclusion, and the Legislature retains its sovereign power to further clarify the distinctions.
While neither the trial court's judgment nor our observations here considers the issues of private and public prescriptive easements upon the waters, we note that the plats at issue require that upon completion of platted waterway work Appellee will dedicate the lake beds and lake front parks to the public or, in the case of very small ponds, to the abutting owners.
In light of the above, the judgment of the trial court is affirmed.
It is so ordered.
ADKINS and HATCHETT, JJ., and MELVIN, Circuit Court Judge, concur.
SUNDBERG, J., concurs in part and dissents in part with an opinion with which OVERTON, C.J., concurs and ENGLAND, J., concurs in part.
ENGLAND, J., dissents.
SUNDBERG, Justice (concurring in part and dissenting in part).
Based upon the reasoning expressed in paragraphs 1 through 18 of the summary final judgment of the trial court adopted by the majority in its opinion, I concur in the conclusion reached as to title in non-meandered fresh water lakes. I dissent from the conclusion of the trial court and the majority of this Court with respect to application of the Marketable Record Title Act as explicated in paragraphs 19 and 20 of Judge Willis' judgment. It is inconceivable to me that a marketable record title act which is aimed primarily at quieting title to private lands can be utilized to divest the people of the State of Florida of lands held in public trust for them. Absent the safeguards of statutory notice and hearing to the public and affected parties and of a conclusion after careful study by the Trustees of the Internal Improvement Fund that a limited grant of sovereign lands will do no public or private harm, it should be presumed that all conveyances of submerged land areas by the Trustees are made with implicit reservation to the state of navigable water. This should be the case even when the description in the conveyance includes navigable water areas. What is essentially a curative act could not have been intended by the legislature to provoke divestiture of public trust lands. This issue was squarely presented in Sawyer v. Modrall, 286 So.2d 610 (Fla. 4th DCA 1974), wherein Judge Walden concluded that the Marketable Record Title Act does operate to cut off claims by the public to sovereign lands after thirty years has elapsed. The Court denied certiorari in Modrall v. Sawyer, 297 So.2d 562 (Fla. 1974). However, Mr. Justice Ervin, dissenting, found conflict on two points and there took issue with the District Court's interpretation of the Marketable Record Title Act. Justice Ervin aptly stated the sentiments which I hold:
"The Marketable Record Title Act (particularly F.S. Section 712.04, F.S.A. thereof) does not by literal interpretation clear title to private persons in open-water sovereignty areas. It is an extreme presumption on the part of the Legislature that by that Act it can expressly invalidate State and Federal public land ownerships by the mere passage of time because of the existence of conflicting private *991 titles thereto which were void ab initio, except where the government title is expressly reserved in its patent or deed. The consequences of such a presumption could create many untoward results highly detrimental to public interests. Presumably thereunder an illegal government deed to a private person covering a sector of any open waterway or harbor would ripen into private ownership after thirty years.
"All conveyances of submerged land areas by the Trustees of the Internal Improvement Fund carry with them implicit reservation to the State of navigable waters, even though the description of an area encompasses navigable water areas  and particularly those which continue in use by the public for navigational purposes, as in the case here  unless contemporaneously with the making of any conveyance it appears after statutory notice and hearing to the public and affected parties and careful study by the Trustees that a limited grant in a sovereignty area will do no public or private harm. Such a reservation by implicit necessity results when the Trustees' deed of conveyance either mistakenly or illegally incorporates sovereignty areas. In such circumstances the deed is void unless there is clear estoppel or inequity. The area covered by the void deed in the instant case has never been filled in, has continued constantly to be in use for boating by the public. Respondent and his predecessors in title have all along been on notice of the sovereign inalienable quality of this open water, navigable area and its obvious public use and status as sovereign land.
"The application of the Marketable Record Title Act when applied to submerged lands must be considered in connection with the case law discussed hereinbefore. Title to sovereignty lands as between the State and private persons must of necessity be determined not on the basis of express reservations in patents or deeds or the length of time of existence of conveyances to private persons, but upon the nature of the particular lands, their navigability and use from the public as well as the private standpoint. The evidentiary circumstances as to the nature of any submerged area must be considered to determine if it was susceptible to alienation.
"The appellate courts ought not in this case to substitute their findings for those of the trier of facts on the question of whether the area is sovereignty land.
"The evils of failure to protect sovereignty areas by the courts where various legal pretexts are resorted to but which have little but technical bases to support them were pointed out by me in a dissent in the case of Trustees of I.I. Fund v. Wetstone, Fla. 1969, 222 So.2d 10. The soundness of the views expressed in that dissent becomes more and more apparent as cases of the kind here treated make their appearance with increasing frequency." 297 So.2d 562, at 565, 566.
Likewise, I dissent from the majority's decision insofar as it approves an adverse judgment against the Attorney General upon his counterclaim. A review of the allegations of the counterclaim reflects that it asserts claims against the plaintiff which are not dependent on title to the lake bottoms. The Attorney General alleges, inter alia:
"1. The Attorney General, acting in behalf of the State of Florida, is authorized to bring actions as parens patriae, trustee, guardian and representative, in behalf of the citizens and residents of the State of Florida, to protect the property, health and welfare of the State of Florida, and the environment of the State of Florida.
"2. ROBERT L. SHEVIN, as Attorney General of the State of Florida, and as the Chief Legal Officer of the State, is required to represent the people of the State when their rights are affected, and to act as legal guardian of the people, under Article IV, Section 4(c), Florida Constitution, 1968 Revision, and the Common Law, such representation including the abatement of public nuisances. Further, ROBERT L. SHEVIN, as Attorney *992 General and Chief Legal Officer of the State, is authorized to seek abatement of public nuisances under the provisions of Section 60.05, Florida Statutes, as amended by Chapter 71-268, Laws of Florida, 1971, and Section 823.04 [823.05], Florida Statutes.
* * * * * *
"4. Counterdefendant in its dredging and water pumping activities in the section of lakes known as Deltona Lakes, has and is continuing to, detrimentally affect the water level in the lake chain commonly known as the Butler Lakes. This change in water level has occurred since the Counterdefendant began pumping operations approximately two years ago, and has resulted in a lowering of the water level in lakes in the Butler Lakes chain, such as Lake Dianne, of approximately five and one-half feet in two years.
"5. The natural high water level for the lakes in the Butler chain is approximately 26 feet above sea level. The level has been lowered due to the operations of Counterdefendant to about 21 feet.
"6. Upon information and belief, Counterdefendant is attempting to lower the water level to 19 feet above sea level for purposes of filling in its newly constructed lake areas, and otherwise facilitate its development interests.
"7. The aforesaid activities of Counterdefendant do and will deleteriously affect, in the State of Florida, the public use and enjoyment of the waters in the Butler chain, and seriously affect property rights of landowners in the lake area.
"8. The Counterdefendants by their activities mentioned above have created, and are creating, a public nuisance in violation of the common law, and the provisions of Section 60.05, Florida Statutes, as amended by Chapter 71-268, Laws of Florida, 1971, and Section 823.05, Florida Statutes, this public nuisance being continued and unabated."
In paragraph 21 of the judgment the trial court asserts:
"... Development by Deltona is said to greatly disturb the clarity of the waters and will adversely affect the fish ecology as well as other wildlife such as wading birds which are features of this chain of lakes. The issues in this case involve the status of the lakes involved as being private property or sovereignty lands under the control or supervision of the defendants. Questions of pollution or damage to other property or to other public areas are not involved. If there are actions of Deltona which may be the subject of public or private claims of wrong which are not dependent upon the status of sovereignty title to the nonmeandered lakes on its property, this case is of course not dispositive of such claims... ."
The trial court then concludes in paragraph 24, however:
"The Court deems that the foregoing is a full and sufficient declaration of rights and liabilities of the parties involved and that they govern themselves accordingly... ."
It is clear to me that the counterclaim alleges that certain actions of Deltona constitute public wrongs which are sought to be vindicated by the Attorney General in these very proceedings. Consequently, I would remand to the trial court for further proceedings relative to the counterclaim of the Attorney General.
OVERTON, C.J., concurs.
ENGLAND, J., concurs in that part of this opinion which finds that the Marketable Record Title Act does not apply to the state.
NOTES
[1] Article V, Section 3(b)(1), Florida Constitution.
[2] Bucki v. Cone, 25 Fla. 1, 6 So. 160, 161 (1889).
[3] United States v. Holt State Bank, 270 U.S. 49, 55-66, 46 S.Ct. 197, 70 L.Ed. 465, 469 (1926).
[4] United States v. Appalachian Electric Power Co., 311 U.S. 377, 407-408, 61 S.Ct. 291, 85 L.Ed. 243, 252-253 (1940), reh. den. 312 U.S. 712, 61 S.Ct. 548, 85 L.Ed. 1143.
[5] The Lucky Lindy. Dragon v. United States, 76 F.2d 561, 563 (5th Cir.1935).
[6] Utah v. United States, 403 U.S. 9, 10, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); United States v. Utah, 283 U.S. 64, 75-76, 51 S.Ct. 438, 75 L.Ed. 844, 849-850 (1931).
[7] Id.
[8] Baker v. State, 87 So.2d 497, 498 (Fla. 1956).
[9] Martin v. Busch, 93 Fla. 535, 112 So. 274, 286 (Fla. 1927).
[10] Cf. Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909).
[11] III Casner, American Law of Property, 261, § 12.29 (1952).
[12] Feig v. Graves, 100 So.2d 192, 194 (Fla.App. 1958).
[13] Osceola County v. Triple E Development Co., 90 So.2d 600, 602-603 (Fla. 1956), inter alia.
[14] Sawyer v. Modrall, 286 So.2d 610, 613 (Fla. App. 1974), cert. den. Fla., 297 So.2d 562.
[15] Trustees of Internal Improvement Fund v. Lobean, 127 So.2d 98, 104 (Fla. 1961).
[16] Trustees of Internal Improvement Fund v. Claughton, 86 So.2d 775, 790 (Fla. 1956).
[17] State of Florida v. Florida National Properties Inc., Fla., 338 So.2d 13. Opinion filed July 14, 1976, reh. den. October 14, 1976.