BOYD, Justice,
dissenting.
I dissent and would approve the district court’s decision because I believe the Marketable Record Title Act when first enacted [1] was intended to apply to claims of the state as well as to those of private persons. Odom v. Deltona Corp., 341 So.2d 977 (Fla.1976). Included among the statutory words “all estates, interests, claims or charges whatsoever,”[2] based on the apparent intent of the legislature, were long-dormant claims of the state grounded on the assertion that state land grants did not include sovereignty lands. This intent is made clear by the provision now codified in section 712.04, Fla.Stat. (1985), providing as follows:
All such estates, interests, claims or charges, however denominated, whether such estates, interests, claims or charges are or appear to be held or asserted by a person sui juris or under a disability, *169 whether such person is within or without the state, whether such person is natural or corporate, or is private or governmental, are hereby declared to be null and void....
(Emphasis supplied). Thus it was clear that claims of the State of Florida were intended to be included within the operation of the law regardless of the theoretical category in, by, or through which the State previously owned the land. The statute’s further provision that it would not affect “any right, title or interest” of Florida “reserved in the patent or deed by which ... Florida or any of its agencies parted with title” further underscores this intent. In order to be removed from the operation of the act, the claim or charge of the state had to be reserved in the deed or patent by which the state conveyed the land.
I completely agree with the petitioner that the Act was never intended to divest the state of ownership of sovereignty lands (or any other state lands) where the state never effectively conveyed such lands into private ownership. However, where the claim or charge in question is the purported right of the state to rescind or alter the express effect of a state patent, deed, or equivalent document on the ground that sovereignty lands were unintentionally, improperly, or mistakenly conveyed thereby, then I believe the act was fully intended to apply and to cut off the viability of any such claims of the state in accordance with the provisions of the act as applied to other persons and other species of real property.
The 1978 amendment[3] cannot be given retroactive effect so as to negate the normal operation of the act in curtailing claims during the period from 1965 [4] to the effective date of the 1978 legislation. The 1978 amendment was not a clarification or resolution of the original intent. It was an amendment or alteration of that intent. The Marketable Record Title legislation and the problems it was designed to remedy were studied for several years prior to the enactment in 1963. See Carmichael, The Current Proposed Marketable Record, Title Act, 34 Fla.BJ. 1056 (1960); Cats-man, Function of a Marketable Title Act, 34 Fla.Bar J. 139 (1960); Aigler, Marketable Record Title Acts, 13 U.Miami L.Rev. 47 (1958). Various alternative provisions on excepting the interests of the state were discussed within the Bar and, presumably, considered by the legislature before final enactment of the language requiring express reservation as a condition for excepting state claims. The legislature obviously knew what it was doing and intended what the words of the act clearly said. Retroactive application would impair the legitimate expectations of landowners who looked to and relied upon the act to extinguish old, stale clouds on the marketability of their titles. I believe that this expectation and assurance, created by the statute, is a species of vested property right that may not be taken away without compensation. See Board of Trustees of the Internal Improvement Trust Fund v. Paradise Fruit Co., 414 So.2d 10 (Fla. 5th DCA 1982), rev. denied, 432 So.2d 37 (Fla.1983).
My view of the operation of the Marketable Record Title Act, as stated above, while consistent with the applicable precedents, has now been repudiated by this Court’s decision in Coastal Petroleum Co. v. American Cyanamid Co., 492 So.2d 339 (Fla.1986). Accepting, therefore, the current binding effect of the Court’s decision in Coastal Petroleum, I dissent to the Court’s application thereof in this case for the following reasons. As will be shown, there are independent grounds for affirmance of the trial court’s judgment.
Even if it is true that title to the land underlying Hurricane Bay passed to the State of Florida upon admission into the Union as an incident of sovereignty, it does not follow that the state was disabled from conveying parts of such property, through its authorized public officials, into private *170 ownership. Respondents hold title to the land in question based upon chains of successive conveyances originating with deeds from the Board of Trustees describing the properties granted. “Simply,” as the district court of appeal found, “the lands have been alienated.” Board of Trustees of the Internal Improvement Fund v. Stevens, 472 So.2d 1287, 1289 (Fla. 2d DCA 1985).
The Board of Trustees, in its brief filed with this Court in the present case, has not identified any basis of support for its contention that the original deeds did not effectively convey all the land described in the deeds, save for the concept of “notice of navigability.” Based on this concept the Board argues that there was an implied reservation of submerged lands as a matter of law. The Board says that the meander of the shore of the bay was a natural monument impliedly incorporated into the legal description. Natural monuments are perfectly acceptable as delimitations of the property covered by a legal description, but it is necessary that they be expressly referred to in the deed in order to be effective.
It might well be argued here, as it was in Coastal Petroleum, that at the time of the Trustees’ deeds in question here, which were made in the 1880’s, the Trustees did not have specific legislative authority to convey the particular kind of sovereignty land granted. (In Coastal Petroleum, the lands in question were said to be under inland navigable rivers. Here the lands in question were, it is argued, under tidal waters contiguous to the Gulf of Mexico.) Pointing out again that the Board has not identified any such specific lack of legislative authority here, I adhere to my view expressed in Coastal Petroleum that a deed from the Trustees is conclusive and determinative of the authority of the Trustees to convey the land described in the deed. The Trustees’ determination that land is of a character giving them authority to sell it is not subject to collateral attack. Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249 (1933). Moreover, the subsequent enactment of laws authorizing the sale of lands under tidal waters would confirm the conveyances under the later-acquired title doctrine. See, e.g., Tucker v. Cole, 148 Fla. 214, 3 So.2d 875 (1941).
Because the lands were thus duly conveyed into private ownership, article X, section 11 of the Florida Constitution, relied upon by the petitioner, has no application to this case. Article X, section 11 expressly recognizes that at the time of its adoption, various sovereignty lands had already been “alienated.” Certainly, the adoption of the constitutional provision in 1968 cannot be allowed to retroactively invalidate deeds because to do so would be a deprivation of vested property rights in violation of more fundamental constitutional principles.
I believe, and the Court should conclude, that the Board of Trustees are estopped to deny the validity of their deeds under the doctrines of both legal and equitable estop-pel. Legal estoppel, or estoppel by deed, serves to prevent a grantor from challenging the validity, correctness, accuracy, or intention as expressed in his deed. It is applicable to state grants of sovereignty land. See, e.g., Trustees of the Internal Improvement Fund v. Lobean, 127 So.2d 98 (Fla.1961).
Equitable estoppel is particularly appropriate in this case. In Trustees of the Internal Improvement Fund v. Claughton, 86 So.2d 775 (Fla.1956), this Court said:
[W]e think that in any case where, as here, the grantees from the Trustees of sovereignty lands have heretofore in good faith and with a bona fide belief of their right to do so under the law, expended money in enlarging, improving and developing their grants and the Trustees and the public have over a long period of time, as here, acquiesced in the ownership by the citizen of the filled-in tract not actually included in the grant, they cannot now be heard to question the ownership of the land as enlarged and developed.
Id. at 792.
Relying on the title conveyed to them by their grantor, the successor in title to the direct grantees from the Board of Trust *171 ees, the respondents filled and bulkheaded a portion of their land that was previously submerged. This work took place between twenty and thirty years ago. Respondents have paid taxes on the land claimed by the Trustees. There are residences on the previously submerged land. In an effort to reach a reasonable compromise of this dispute, respondents have quitclaimed to the state the submerged land described in their deeds lying beyond their bulkhead. There is no compelling reason not to quiet respondents’ title to the lands they have improved and marshalled for productive use.
The effect of the Court’s holding in Coastal Petroleum as applied here is tantamount to a statement that grantees of land under patents or deeds of the Board of Trustees were not entitled to rely on the express terms of those patents or deeds. There is an apparent feeling that there is no great injustice in this because any sovereignty lands included in the legal descriptions set forth in such deeds were reserved as a matter of law. A grantee from the state, however, should not be required to consult legal counsel to find out whether the state’s deed means what it says. How difficult would it have been for the Board of Trustees to set forth general reservations of sovereignty lands if that was their intent and their understanding of the law at the time of the ancient land grants? Moreover, the limitations and restrictions embodied in the so-called public trust doctrine were not clearly developed until the rendering of court decisions years and even decades after the Trustees’ early land grants.
The purpose underlying the Trustees’ policy of liberal grants of public lands, including sovereignty lands, during the nineteenth century was to promote economic development and “internal improvements.” There was also some revenue derived from the land sales. It was contemplated that submerged lands would be filled to facilitate the construction of improvements to benefit shipping, fishing, manufacturing, and other industries. Simple fairness to those who responded to the incentives thus offered mandates that we hold that grantees were entitled to rely on the Trustees’ interpretation of their own constitutional and statutory authority.
One final point must be addressed. The respondents stipulated that the land claimed by the Trustees was sovereignty land. They did so, as the Court points out, to negate the existence of any factual issue that would preclude summary judgment. The obvious purpose was to squarely present the MRTA issues for determination. It seems clear to me that the respondents took this step on the advice of counsel because the existing precedents strongly indicated that respondents would prevail on the question of the effectiveness of MRTA to cut off the long-neglected claim of the state and also the question of the retroactive effect of chapter 78-288. See, e.g., Askew v. Sonson, 409 So.2d 7 (Fla.1981); Odom v. Deltona Corp, 341 So.2d 977 (Fla.1976); Board of Trustees v. Paradise Fruit Co., 414 So.2d 10 (Fla. 5th DCA 1982), rev. denied, 432 So.2d 37 (Fla.1983); Sawyer v. Modrall, 286 So.2d 610 (Fla. 4th DCA 1973), cert. denied, 297 So.2d 562 (Fla.1974). Now that this Court has reversed the trend, respondents should be allowed to withdraw their stipulation so that the factual questions pertaining to the natural history of the lands in question can be litigated. The Board of Trustees, having prevailed on the issue of principal concern to them, should have no objection to this as a matter of simple fairness to the respondents. But for the stipulation, there would have been substantial issues of material fact on the sovereignty land question, there being some indication that the land may have been above high water when originally conveyed into private ownership, and further that it became covered with water not by a gradual rise of the high water mark, but by a sudden tempest (hence the name “Hurricane Bay”).
It is illegal and immoral for the state to persist in its claim against the privately owned land in question in this case. I therefore dissent.

. Ch. 63-133, Laws of Florida.

. § 712.04, Fla.Stat. (1983).

. Ch. 78-288, Laws of Fla.

. As originally enacted, the act provided a two-year period for the assertion of claims that were more than thirty years old. Ch. 63-133, § 9, Laws of Fla.