## AMERICAN CYANAMID COMPANY v. STATE OF FLORIDA
### Case No. GCG-80-290
Tenth Judicial Circuit, Polk County
July 27, 1981

Hume F. Coleman, Chesterfield Smith, Holland & Knight, for plaintiff.

Robert J. Beckham, James R. Hubbard, Beckham & McAliley, and Daniel J. Wiser, Roberts, Miller, Baggett, LaFace, Richard & Wiser, for defendant, State of Florida.

GUNTER STEPHENSON, Circuit Judge.

Plaintiff, American Cyanamid Company (ACC), filed and served its motion for summary judgment, with supporting materials, on May 20, 1981. A hearing was held on the motion on July 20, 1981. Both parties were represented at the hearing.

After consideration of the matters of record and argument of counsel, this Court has determined that there is no genuine issue of material fact and ACC is entitled to judgment, as a matter of law, against Defendant, State of Florida, through the Board of Trustees of the Internal Improvement Fund (the "Trustees"), and the motion for summary judgment is granted.

This Court finds that ACC owns the following described land (the "land"):

All in Township 31 South, Range 23 East, Polk County, Florida:

*Section 23*: The N-½ of SW-¼, and the S-½ of SE-¼ of NW-¼, and the N-½ of NW-¼ of SE-¼, and the SW-¼ of NE-¼, and the S-½ of NW-¼ of NE-¼ and the N-¾ of E-½ of NE-¼ less that part east of the Old Highway 37 and

east of the Seaboard Coast Line Railroad Company right-of-way (formerly Seaboard Air Line Railroad Company and formerly Charlotte Harbor and Northern Railway)

There is no genuine issue as to the facts material to this case.

The State of Florida was admitted to the Union on March 3, 1845. Under the "equal footing" doctrine the State acquired on that date title to land under navigable waters, that land being sovereignty land.

The ACC land in question was surveyed by the U. S. government surveyor in 1855. The official government survey reflects no meandered watercourses on the land. The surveyor did find a "creek" 19.8 feet wide on the west line of Section 23, and a "creek" indistinguishable from a "prairie" on the east line of Section 23. The State of Florida, through the Trustees, has maintained in its records a duplicate original of this government survey. Two years after the survey was complete, in 1857, the land was acquired by the State under a patent from the United States. A Certificate of the Commissioner of Agriculture of the State, recorded in the public records of Polk County, Florida, recites that the patent was issued pursuant to an Act of Congress approved September 28, 1850. This act is commonly called the Swamp and Overflow Lands Grant Act, and it authorizes the conveyance by the United States to the various states of swamp and overflow land. The State accepted title to the land as swamp and overflow land.

There next appears of record in Polk County, Florida, a deed from the Trustees to Florida Land and Improvement Company, dated January 5, 1883, filed June 18, 1883, in Deed Book "XY," page 29, describing the land. There is no reservation of any right, title or interest by the Trustees recited in the deed. To the contrary, the deed recites that the land was acquired by the State pursuant to the Act of Congress of September 28, 1850 (the Swamp and Overflow Lands Grant Act), and the land was being conveyed pursuant to an Act of the General Assembly of the State of Florida entitled "An act to provide for and encourage a liberal system of Internal Improvements in the state," approved January 6, 1855. This act authorized the Trustees to convey to private parties swamp and overflow land. This finding by the Trustees in 1883 that the land was swamp and overflow land is consistent with the United States government survey in 1855 indicating there are no meandered watercourses on the land, and with the 1857 patent from the United States to the State reciting the land to be swamp and overflow land.

The question of whether this 1883 Trustees' deed conveyed fee simple title to the land to Florida Land and Improvement Company is one to be answered under Florida law by state courts. Once title was transferred

by the United States to the State, by whatever means, the effect of a later deed by the Trustees is a state law matter.

Subsequent to the 1883 deed the land was conveyed through numerous deeds of record in Polk County, Florida, with no mention of the Trustees or the State, until title became vested in ACC through a deed from Amalgamated Phosphate Company, dated and recorded in the public records of Polk County, Florida, in 1939. Since ACC and its predecessors acquired title to the land by a chain of title originating with the Trustees in 1883, all ad valorem taxes assessed against the land, both State and county, have been paid, and ACC has openly, used, occupied and possessed the land, primarily for agricultural purposes.

Since 1972, the Trustees have compiled, pursuant to §253.073(8), Florida Statutes, at least three inventories that purported to list all state-owned land in Polk County. None of those inventories included the land as state-owned.

A portion of a ˜watercourse flows through the land. The United States Government surveyors described it as a creek at that point. In modern times, it has been called the south prong of the Alafia River. There often is no water flowing in the watercourse.

ACC has not mined the land, but plans to mine or conduct related mining activities on it, provided the necessary regulatory permits from the appropriate government agencies are obtained.

The Trustees for the first time claimed in 1980 that a portion of the watercourse that existed on the land in 1845 was navigable, and that the land lying within its ordinary high water line is therefore sovereignty land owned by the Trustees. That claim clouded ACC's title to the land and impaired the exercise by ACC of its rights to use the land.

The Trustees' sole *ownership* claim to that portion of the land within the ordinary high water line of the Alafia River is based on a *1980* determination by the Trustees that the watercourse was navigable in *1845*. ACC and the Trustees both acknowledge the existence of inalienable government rights over the land, but the Trustees' claim of *ownership* goes far beyond a mere assertion of police power over the land. As stated in *Odom v. Deltona Corp.,* 341 So.2d 977, 987 (Fla. 1976):

> It is historically recognized in this country that the state and federal governments can regulate uses of both land and water areas in such matters as zoning, safety regulations and other uses of property. Specifically, the State of Florida has the inherent police power to enact such standards and regulations as may be necessary for the public interest relating to the use

and development of all public and private water areas within the State of Florida, subject to such authority as may be specifically reserved in the federal government. The state may require private owners to secure permits for modifications of lake bottoms and contiguous areas which may be required for the public interest according to reasonable and uniform standards. It is equally well recognized that this state regulation must be accomplished in a constitutionally permissible manner.

The Trustees' claim that it still *owns* the non-governmental rights in the land coursed by the non-meandered Alafia River is incorrect in light of the record facts of this case.

*Odom v. Deltona, supra,* at 984, recognized that the State has the right to regulate a watercourse whether it is navigable or non-navigable. Indeed, even the public trust in a navigable watercourse is satisfied by an impressed governmental servitude, without regard to title to the underlying bottom. Maloney, Plager & Baldwin, *Water Law and Administration,* C.1968, Ch. 12.

The record before this Court shows that no watercourse on the land was meandered by the official government surveyor. As stated in the trial court's opinion *Odom v. Deltona, supra,* at 983, the government surveyors were instructed to meander navigable bodies of water. Non-meandered watercourses are presumed non-navigable; and thus, lands beneath them may be conveyed into private ownership. *Id.* at 989.

The Trustees' claim of navigability is based upon what the United States Government surveyor reflected as the stream widths in his field notes and on current physical characteristics of the watercourse.

It is significant that the surveyor described the Alafia River on March 9, 1855, as a creek, 19.8 feet wide at the point it crosses the west section line of Section 23. On the east line of Section 23 the surveyor indicated no width for the creek and stated that it had lost its distinctive creek form in the prairie, meaning Hookers Prairie, a watercourse not claimed by the Trustees to be navigable. Therefore, at some point between the west and east section lines of Section 23, the "creek" became a prairie, the ownership of which is not claimed by the Trustees. These recitations of fact by the surveyor do not overcome the presumption of non-navigability. To the contrary, these factual findings by the surveyor resulted in the determination by him of non-navigability. Obviously, the facts that resulted in a presumption of non-navigability cannot be used as a basis for overcoming that presumption.

The Trustees apparently have recently determined that based on current channel dynamics, including creek flow, the watercourse in the

area in question, now called the Alafia River, could have easily supported small craft navigation in 1845. However, the Trustees have also determined that the flow today is much less than in prior years. If this is correct, the United States Government surveyor years ago determined that the watercourse was non-navigable based on a larger watercourse than exists today. The recognition by the Trustees almost one hundred years ago of non-navigability of the creek by conveying it as swamp and overflow land cannot be overcome by a factual finding of a reduced flow and an opinion of present-day officials that the creek might have then supported small craft.

The trial court in *Odom v. Deltona, supra,* was urged to consider not what the surveyors had done in their surveying efforts, but what they should have done, which is the position the Trustees take here. The trial court rejected the argument that the surveyor incorrectly made a determination of non-navigability, stating, at 984:

> This court is in a poor posture to evaluate the work of those surveyors of many decades past. It can only be accepted that they did their job as instructed and recorded what they found then, which may or may not be what appears now. Fresh water lakes and ponds do change rather significantly because of both natural and artificial alterations in the areas involved. It is to be observed that governmental conveyances were made in reliance on them and the grantees of such conveyances had the right to assume the U.S. government and the Trustees were acting lawfully.

The Florida Supreme Court in *Odom* quoted the trial court's final judgment and did not alter it.

The State argued in *Odom v. Deltona* that the grantee of swamp and overflow land from the Trustees took title with "notice of navigability," and the conveyance did not include sovereignty land. The Supreme Court agreed in the instance of a larger lake, such as Lake Okeechobee, a 500,000 acre lake, citing to the case of *Martin v. Busch,* 112 So. 274, 286 (Fla. 1927).

However, the lands involved in *Martin v. Busch* were unsurveyed at the time of their conveyance by the Trustees. The Trustees' argument simply does not apply to the present case, where the land was surveyed before it was acquired by the State and then conveyed by the Trustees; and no watercourses on the land were meandered by the original government surveyors.

The case of *Martin v. Busch* established the concept that a grantee of *unsurveyed* lands bordering on an obviously navigable watercourse

takes title with notice that a conveyance of swamp and overflow land does not include sovereignty land. The true import of the holding in that case was highlighted in the Final Committee Report filed by the State Lands Study Committee in March, 1979.

That Committee, created by Chapter 78-301, Laws of Florida, stated:

> It is important to note the factual context of the case in which this statement was made. In *Martin v. Busch,* the plaintiff acquired title *before* the lands were surveyed. The lands were described in the Trustees' deed as being unsurveyed sections embraced between the line of existing surveys and the margins of Lake Okeechobee (112 So.2d [sic] 274 at 280-281). The court noted that the lands were to be 'located by a contemplated official survey' (*Id.*, pp. 282, 284). Thus the issue in *Martin v. Busch* involved determinations of the *exterior* limits of unsurveyed land where by the very terms of the conveyance one boundary of the land was to be Lake Okeechobee, a waterbody which was obviously navigable . . . . (emphasis in original) (p. 8 of report).

Because *Martin v. Busch* concerned a conveyance of unsurveyed swamp and overflow lands, the "notice of navigability" argument it set forth is really a "notice of imperfect title pending survey" doctrine. The *Martin* court stated, at 285:

> Where sales and conveyances of unsurveyed swamp and overflowed lands are made by the trustees of the internal improvement fund, it is the duty of the state to survey the land intended to be conveyed so that the location and boundaries thereof may be identified and established.

By contrast, once an official government survey of land establishes no navigable watercourses on the land, and the land is subsequently acquired by the State and then conveyed by the Trustees as swamp and overflow land without limitation of the full acreage shown by the survey, and with no reservation of State-owned sovereignty land, the land so conveyed is not subject to any "notice of navigability". This conclusion is supported by the following additional statement in *Martin v. Busch,* at 285:

> When such boundaries are duly established [by survey], sales or conveyances . . . are to be regarded as made with intent that such sales and conveyances shall and do conform to the boundary lines thus established between the sovereignty lands . . . and the swamp and overflowed lands . . . .

The same premise was stated in *Pierce v. Warren,* 47 So.2d 857, 860 (Fla. 1950), as follows:

> . . .When the sale was made, it became the duty of the state to survey the property to fix its character and boundaries, *Martin v. Busch,* 93 Fla. 535, 112 So. 274, and this was not done '*** a complete and perfect title' could not vest in appellants' predecessor 'to unsurveyed public land *** until the lands [had] been identified by a survey authorized by law.'

As distinguished from its holding in *Martin v. Busch,* involving unsurveyed lands under and near Lake Okeechobee, the Trustees' here argue that non-meandering reflected by an official government survey of 1855 should be replaced by a subsequent survey conducted one hundred twenty-five years later by experts employed by the Trustees. If this present-day survey is permitted, the result will upset record ownerships of the land of long duration based on a factual determination made by the Trustees in 1883, that such land was swamp and overflow land. The *Odom* court stated, at 988:

> Nevertheless, as the trial court observed, at this late date we are not in a position 'to evaluate the work of those surveyors of many decades past' and can merely accept their work as correct, particularly since the state itself has relied upon it constantly since it was completed.

Presumably, in *Odom v. Deltona* the Trustees were prepared to offer evidence in support of its contention that the lakes were navigable in their natural state, thus making the navigability question a disputed issue of fact. The Trustees' arguments on appeal concerning the legal tests of navigability and the "notice of navigability" concept from *Martin v. Busch* confirm that it intended in *Odom* to contest the issue of navigability at trial. Because *Odom* was a summary judgment case, and summary judgment may only be granted when it is clear that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law, the majority in *Odom* necessarily concluded that whether the lakes were navigable or non-navigable was immaterial. It would not allow the Trustees in *Odom* to contest the government surveyor's conclusion that the lakes were non-navigable, nor the Trustees declaration by their deed that the lands were swamp and overflow lands.

The legal principles upon which the Supreme Court predicated its ruling in *Odom v. Deltona* that the lakes were privately owned are thus clearly applicable here without any factual inquiry into navigability.

In effect, *Odom v. Deltona* resolved the issue by combining the presumptive effects of non-meandering with the estoppel doctrine. A grantee of unsurveyed land takes with notice that any of the described property which is determined by the subsequent survey to be under navigable waters could not be included in his deed. But when the survey is later conducted, the failure of the surveyor to meander the watercourse gives rise to a rebuttable presumption of non-navigability, so that the land is presumably non-sovereignty in character. In that situation, the implied "notice" principle is no longer of any force or effect. If the Trustees by their conduct accept the surveyor's judgment and do not come forward within a reasonable time to rebut the presumption, the grantee is properly entitled to exercise the ordinary incidents of ownership over all the land. At some point in time title to land must be protected from sovereign land claims. Allowing 125 years (1855 to 1980) to pass before making a claim precludes the Trustees by law from asserting any ownership rights that were not expressly reserved in the deed. By their own definition, lands conveyed long ago by the Trustees could not be sovereignty land because the Trustees could not then convey such land; they could convey swamp and overflow land — and they did.

The same reasoning applies to grants made after and upon the basis of a government survey. Because *Martin v. Busch* applies only to conveyances of unsurveyed land, the grantee who acquires a parcel of surveyed swamp and overflow land from the Trustees without any explicit reservations may validly assume that a non-meandered waterbody is not navigable. Through this reasoning, and not by examining the actual navigability of the lakes, the *Odom v. Deltona* court held that the lakes were privately owned.

> Section 197.228(2), *Fla. Stat.* (1979), provides: Navigable waters in this state shall not extend to any permanent or transient waters in the form of so-called lakes, ponds, swamps or overflowed lands, lying over and upon areas which have heretofore been conveyed to private individuals by the United States or by the state without reservation of public rights in and to said waters.

The trial court in *Odom v. Deltona, supra,* at 982, said of the statutory language:

> This statute is at pains to recognize conveyances by governmental authority purporting to transfer to private ownership a described area as effective to include lakes, ponds, swamp and overflow land unless the instrument makes a reservation of them.

No watercourses on the land were meandered when it was officially surveyed by the federal government in 1855. It was orginally acquired by the State of Florida in 1857 from the federal government as swamp and overflow land, and conveyed as such by the Trustees in 1883 into private ownership. Subsequently, the Trustees never claimed it as State-owned until 1980. On those facts, the Trustees cannot now for the first time claim *ownership* by questioning their own recitals that the land in 1883 was swamp and overflow land.

The doctrine of legal estoppel, or estoppel by deed, is applicable because the conveyance of the land by the Trustees as swamp and overflow land after it had been surveyed made no reservation for watercourses. At least three decisions of the Florida Supreme Court support the legal estoppel doctrine under the facts presented by this record. They are *Odom v. Deltona Corp., supra; Trustees of Internal Improvement Fund v. Lobean, supra; Daniell v. Sherrill,* 48 So.2d 736 (Fla. 1950).

In *Daniell v. Sherrill* an agency of the State sought to quiet title to land on Santa Rosa Island against the claim of private owners. The latter were successors in interest to persons who obtained tax deeds from the State. The tax deeds were admittedly invalid because the United States owned the land at the time the taxes were assessed. Later the State obtained title by purchase from the United States.

On these facts the court held that the United States, or any purchaser from the United States other than the State of Florida, could have challenged the validity of the tax deeds because the land was not subject to taxation. However, the State was estopped by its deeds from denying the title of its grantees or its own authority to sell. The court said, at 740:

> Applying the cited authorities, it is our holding that, regardless of the invalidity of the tax deeds, and the untruth of their recitals, the State of Florida, the grantor therein, is estopped to question the validity of such deeds and the truth of their recitals.

A decade later the court applied its holding of legal estoppel in the *Daniell* case to a Trustees' conveyance of submerged sovereignty lands. In *Trustees of Internal Improvement Fund v. Lobean, supra,* the Trustees erroneously conveyed submerged lands lying in Gasparilla Sound to Lobean by a 1946 Murphy Act deed. Because the lands were sovereignty, they were not subject to taxation and could not be properly conveyed under the Murphy Act. Subsequently, the Trustees, over Lobean's objection, sold the same land under provisions of the bulkhead law.

Upon suit against the Trustees by Lobean, the trial court ruled in favor of the Trustees because of the void assessment of taxes against submerged lands not subject to taxation. The trial court expressly rejected Lobean's argument of estoppel.

The Supreme Court held against the Trustees because legal estoppel, or estoppel by deed, operated against the Trustees even though the Murphy Act deed was void. The holding in *Lobean* demonstrates that the doctrine of legal estoppel is applicable to Trustees' conveyances of sovereignty lands.

In 1976 the Supreme Court again applied legal estoppel against the Trustees in *Odom v. Deltona Corp., supra.* The Court there stated, at 989:

> Stability of titles expressly requires that, when lawfully executed land conveyances are made by public officials to private citizens without reservation of public rights in and to the waters located thereon, a change of personnel among elected state officials should not authorize the government to take from the grantee the rights which have been conveyed previously without appropriate justification and compensation. If the state has conveyed property rights which it now needs, these can be reacquired through eminent domain; otherwise, legal estoppel is applicable and bars the trustees' claim of ownership, subject to rights specifically reserved in such conveyances.

The *Odom* court cited *Lobean* in support of that statement. When the *Odom* discussion of legal estoppel is considered with its statement that non-meandered water bodies are presumed non-navigable, the result is obvious: under the facts and circumstances developed by the record in this case, the Trustees are legally estopped to rebut the presumption of non-navigability after the government survey has stood unimpeached for so many years. The Trustees expressly stated in the initial deed that the land was swamp and overflow land, which by definition means it is not sovereignty land and that the Alafia River at the point where it courses the land was not navigable. See §253.03(1) (a) and (b), *Fla.Stat.* (1979). The Trustees are estopped from presenting the issue of sovereignty ownership for determination now by this Court.

In addition, for many years ACC and its privies, under claim of title to the land in question, have paid taxes assessed against the land, openly occupied, possessed, and exercised complete dominion over the land. During the same period of time, until 1980, the Trustees refrained from asserting any adverse ownership claim to the land. These facts support the position that the Trustees are equitably estopped from

claiming ownership of the land. *See, e.g., Odom v. Deltona Corp., supra; Bryant v. Peppe*, 238 So.2d 836 (Fla. 1970); *Trustees of Internal Improvement Fund v. Claughton, supra; Trustees of Internal Improvement Fund v. Bass*, 67 So.2d 433 (Fla. 1953); *Daniell v. Sherrill, supra; Florida Board of Forestry v. Lindsay*, 205 So.2d 358 (Fla. 2d DCA 1967); *Rotolante v. Metropolitan Dade Co.*, 143 So.2d 212 (Fla. 3rd DCA 1962).

The failure of the Trustees to include any of the land in inventories of State-owned lands contributes to the determination by this Court that the Trustees are estopped to claim ownership of the land. Since 1967 the Trustees have had a statutory duty to inventory *all* State-owned lands. Chapter 67-2236, Laws of Florida, amended §253.03(7), *Fla. Stat.* (1965) to read, in part, "The Trustees of the Internal Improvement Fund shall maintain a current inventory of all state owned lands."

Although that statute has been amended, the duty to inventory the lands remains with the Trustees. The failure to include the ACC land in the statutorily required inventory of *all* State-owned lands is another fact estopping the Trustees.

This court does not determine vel non the navigability of the Alafia River. It does determine that: the Trustees in 1883 determined that the land through which the Alafia River coursed was swamp and overflow land; the act of the Trustees in making that determination was a lawful act; and at this late date, neither the Trustees nor their successors nor those claiming under them can attack that determination. The deed in 1883 from the Trustees to Florida and Improvement Company (ACC's privy) is now impervious to attack by the Trustees.

But even if the Trustees could at this late date assert that the portion of the land coursed by the Alafia River was sovereignty land in either 1845 or 1883, or both, or now, their ownership claim still would be barred by the Florida Marketable Record Title Act (the Act), Chapter 712, Florida Statutes. ACC's "roots of title" were of record in Polk County for more than 30 years prior to the effective date stated in the Act without any adverse claim of the Trustees having been properly recorded.

In *Odom v. Deltona Corp., supra,* the Florida Supreme Court held that "claims of the Trustees to beds underlying navigable waters previously conveyed are extinguished by the Act." The pertinent passages from the majority opinion, at 989-990, are quoted below:

> . . . It seems logical to this Court that, when the Legislature enacts a Marketable Title Act, as found at Chapter 712, Florida Statutes, clearing any title having been in existence

thirty years or more, the state should conform to the same standard as it requires of it citizens; the claims of the Trustees to beds underlying navigable waters previously conveyed are extinguished by the Act. Stability of titles expressly requires that, when lawfully executed land conveyances are made by public officials to private citizens without reservation of public rights in and to the waters located thereon, a change of personnel among elected state officials should not authorize the government to take from the grantee the rights which have been conveyed previously without appropriate justification and compensation.

\* \* \*

It should be reiterated that, as stated in *Sawyer, supra,* ancient conveyances of sovereign lands in existence for more than thirty years, when the State has made no effort of record to reclaim same, clearly vests marketable title in the grantees, their successors or assigns and the land may be recovered only by direct purchase or through eminent domain proceedings.

The Fifth Circuit Court of Appeals recently applied the *Odom v. Deltona* holding to a conveyance of submerged sovereignty land in tidal waters bordering the Florida Keys. In *Starnes v. Marcon Inv. Group,* 571 F.2d 1369 (5th Cir. 1978), the court correctly interpreted *Odom* as having held that the Act extinguished the Trustees' claim of title to sovereignty lands. *See also, Sawyer v. Modrall,* 286 So.2d 610 (Fla. 4th DCA 1973), *cert. denied,* 297 So.2d 562 (Fla. 1974).

In 1978, the legislature amended the Marketable Record Title Act so as to exclude from its operation "[s]tate title to lands beneath navigable waters acquired by virtue of sovereignty." See §712.02 (7), *Fla.Stat.* (1979). That amendment is prospective in application because of the lack of any express legislative intent to apply it retroactively. *State of Florida, Board of Trustees of the Internal Improvement Trust Fund v. Laney,* Case No. 80-1525 (3rd DCA June 2, 1981); *State of Florida, Department of Natural Resources v. Contemporary Land Sales, Inc.,* Case No. 80-375 (5th DCA May 20, 1981).

"It is a well-established rule of construction that in the absence of clear legislative expression to the contrary, a law is presumed to operate prospectively." *Waler & La Berge v. Halligan,* 344 So.2d 239, 241 (Fla. 1977). "The rule that statutes are not to be construed retrospectively, unless such construction was plainly intended by the Legislature, applies with peculiar force to those statutes the retrospective operation of

which would impair or destroy vested rights." *In re Seven Barrels of Wine,* 79 Fla. 1, 82 So. 627, 632 (1920).

Thus, *Odom* is reliable precedent in Florida for the proposition that the Act operates to vest fee simple title in a grantee of land, even if it is assumed to be sovereignty land, where the chain of title extends back more than thirty years prior to the effective date stated in the Act.

The Trustees claim in their answer, at paragraph 26(j), that its ownership of the land is preserved against the operation of the Act by the filing of notice of the Trustees' title by the attempted recording of its Lease 224-B to Coastal Petroleum Company. That lease was first executed in 1946, but did not appear among the records of Polk County until 1954, when an unexecuted, printed, and conformed copy was attached to a recorded royalty deed from Coastal Petroleum Company to a third party. The Trustees were not parties to that royalty deed.

That recording was simply insufficient to act as an exception to the marketability of ACC's title to the land. The recordaton of an unexecuted, printed, and conformed copy as an attachment to a royalty deed from Coastal Petroleum Company to a third party is not the recordation of a "title transaction" as contemplated by §712.01 (3), *Fla.Stat.* (1979). In addition, the description of lands in the lease as "bottoms of and waterbottoms adjacent to" the Alafia River, without reference to a section, township, and range, or other means of locating the lands is not sufficient to comply with Section 712.03, Florida Statutes, as an exception to marketability. A description of land, submerged or high and dry, must be sufficiently definite and certain to enable the land to be identified; otherwise, the instrument is void for uncertainty. *Deering v. Martin,* 116 So. 54 (Fla. 1928); *Commyns v. Latimer,* 2 Fla. 71 (1848). See also the 1981 amendment to Chapter 712, Florida Statutes, Laws of Florida 81-242, which appears to codify existing law that a "'Title transaction' means any recorded instrument or court proceeding which affects title to any estate or interest in land, *and which describes the land sufficiently to identify its location and boundaries."*

Lease 224-B purports to cover (1) all waterbottoms of the Gulf of Mexico within 10.36 miles of the shore and included within the described drilling blocks, (2) all submerged lands and waterbottoms of all bays, sounds, and bayous of the Gulf, and adjacent government waterfront lots contiguous to the waterbottoms of the Gulf, along with (3) the bottoms of and waterbottoms adjacent to the Alafia River and five other named rivers, and their sloughs, arms, and overflow lands. The total of (1), (2), and (3) is supposed to be 1,974,360 acres, according to the lease. There is absolutely no guide within Lease 224-B to locate the acreage relevant to the Alafia River.

The portion of the Alafia River included in Lease 224-B included at most (and the Court does not decide whether the lease included *any* portion of the Alafia River) that portion that was meandered in the official government survey. There could have been no intent on the part of the Trustees to lease the mineral rights to any part of the non-meandered and presumptively non-sovereignty portion of the Alafia River, where they had already conveyed to others as reflected in recorded instruments.

Since the recordation of a copy of Lease 224-B by attachment to the royalty deed is insufficient to preserve the claim of the Trustees, I find that even if the portion of the Alafia River running through the land could be successfully asserted by the Trustees to be navigable, the Trustees would be barred by virtue of Chapter 712, Florida Statutes, from claiming any *ownership* interest in the land.

Although it is apparent that ACC does not have to rely on adverse possession to perfect its title to the land, ACC has been in open, exclusive, notorious, and adverse possession of the land since its purchase in 1939, and has used the land primarily for agricultural purposes since that date. Accordingly, the Trustees are barred by the doctrine of adverse possession from claiming ownership of the land.

The adverse possession statute, §95.16, *Fla. Stat.* (1979), provides, in pertinent part, as follows:

> 95.16 Real property actions; adverse possession under color of title.
> (1)   When the occupant, or those under whom he claims, entered into possession of real property under a claim of title exclusive of any other right, founding the claim on a written instrument as being a conveyance of the property . . . and has for 7 years been in continued possession of the property included in the instrument . . . the property is held adversely.

Prior to 1975, §95.15, *Fla. Stat.* (1973) provided that adverse possession did not run against the State. That statute was repealed effective January 1, 1975, meaning that title to State-owned lands can now be acquired by adverse possession. See Ch. 74-382, Laws of Florida. Section 95.022, *Fla. Stat.* (1979), provides that any action that would have been barred when that act became effective in 1975, and that would not have been barred under prior law, could be commenced before January 1, 1976. If not commenced by that date, the action would be barred.

Thus, the Trustees had only until January 1, 1976, to institute suit against any party in adverse possession of State property for at least

seven years prior to that date. Because ACC has been in statutory adverse possession of the land for over forty years, the Trustees are barred from now claiming *ownership* of the land.

This Court accepts the statement of the Trustees in their response to the Motion for Summary Judgment (page 3):

> The few acres of submerged land here, to which the Trustees assert sovereignty title are of little practical use to Cyanamid, even if owned by it. It is doubtful that it could mine the stream, due to environmental constraints, if its title were clear. The lands are presented here rather as a pawn in another game.

That game obviously is the several conversion actions brought by the Trustees and Coastal Petroleum Company against ACC and six other phosphate mining companies, now pending in the United States District Court for the Northern District of Florida. The Trustees there seek not governmental control of streams, but only money damages for the alleged conversion of phosphate rock from land in Polk County embraced in conveyances without reservations long ago executed by them.

Under such circumstances, the Trustees should be held to the same principles of law that apply to private suitors seeking money damages. A concurring opinion by Justice Drew (with which all participating justices unanimously concurred) in *Trustees of the Internal Improvement Fund v. Lobean, supra,* at 104, sets it forth pungently and well:

> In the dim, distant past, when the State and its subdivisions were concerned almost exclusively with the business of government, the argument . . . that the doctrine of legal estoppel is not applicable to the State would have been sound. In this age, however, when the sovereign is engaged in almost every business activity known . . . such argument falls by its own weight. The doctrine is, of course, not available when its application would affect the sovereign power of the State in the exercise of purely governmental functions. But when the State is engaged in the business of selling land or operating beyond its governmental area, I can see no reason to exempt it from the same rules and regulations that the State itself imposes on its citizens. Under the circumstances presented by this record, a private citizen would have been estopped. I can think of no reason why the State should not be held to the same degree of conduct.

The foregoing findings of fact and conclusions of law are a full and sufficient declaration of the rights of the parties involved here. They, and those claiming under them, may govern themselves accordingly.

ACC is found by this Court to be the lawful owner of the land, with full right, use, possession and enjoyment thereof, free from the claims of others. ACC may mine or otherwise utilize the full proprietary interest in the land so long as the requirements of government at all levels under the police power are duly met. While it is perhaps not necessary that it be stated, the State of Florida quite obviously retains its governmental powers over the land.

This is a final judgment, and judicial labor is completed. This Court assumes that the parties will abide by a judgment of a court of competent jurisdiction or by that of appellate courts upon appeal or review of such judgment. However, jurisdiction is reserved for such post-judgment procedures as may be required to give effect to pronouncements herein made.